## S11F0892. HARRIS v. SNELGROVE.

(718 SE2d 300)

HINES, Justice.

Lynda Harris, formerly known as Lynda H. Snelgrove ("Harris") was granted an appeal from the superior court's denial of her motion for new trial, as amended, following its entry of a final judgment and decree of divorce and order of custody ("decree"). The decree dissolved her seven-year marriage to Robert Snelgrove ("Snelgrove"), divided the marital property, provided for child support, and awarded custody of the parties' minor child, R. A. S., to the paternal grandparents, intervenors Cary and Kathleen Snelgrove ("grandparents").[1] Harris states that she is appealing the decree's awards of custody, child support, and equitable division on the basis that the evidence at trial does not support them. For the reasons that follow, we affirm the judgment of the superior court.

Harris and Snelgrove were married on October 10, 2002, and their only child together, a son, R. A. S., was born in 2002. Harris filed the present action for divorce from Snelgrove on April 3, 2009, and the grandparents intervened, seeking custody of their grandson. The superior court appointed a guardian ad litem ("GAL"), and after interviewing the parties and completing an investigation, the GAL recommended to the court that custody of the minor child be given to the grandparents. The superior court issued the decree following a three-day bench trial at which the court heard extensive testimony from all the parties, received the report from the GAL, and considered substantial documentary evidence. The decree, inter alia, awarded sole legal and physical custody of R. A. S. to the grandparents with specified visitation to Harris and to Snelgrove, and directed that Snelgrove pay $287 per month and Harris pay $780 per month to the grandparents for child support; also Harris was ordered to pay Snelgrove $20,000 "as reimbursement . . . for his time, toil and labor in the remodeling and improvements made to the marital residence during the marriage."

1. Harris first contends that the superior court erred by not allowing her counsel to fully and thoroughly cross-examine the GAL at trial in that counsel was not permitted to question the GAL about "her knowledge of the applicable legal standards" in a custody award to a third party, and then after that line of questioning was barred, counsel was not permitted to further cross-examine the GAL. But, the contention is unavailing.

The record reveals that counsel for Harris attempted to question

---

[1] Harris's application for discretionary appeal was granted pursuant to this Court's pilot project for divorce cases, now set forth as Supreme Court Rule 34 (4).

the GAL on the applicable law, and in particular, whether the GAL was familiar with a named appellate case, and the superior court halted that line of questioning, reminding counsel that the court, and not the GAL, was the arbiter of the law in regard to the custody decision. The role of the GAL at trial is not to expound on matters of law, but rather the GAL is qualified as an expert witness on the best interest of the child or children in question. Uniform Superior Court Rule 24.9 (7); see also *Albany Surgical, P.C. v. Dept. of Community Health*, 257 Ga. App. 636, 640 (5) (572 SE2d 638) (2002). Accordingly, the GAL may testify about the facts provided by witnesses and sources, other results of the GAL's investigation, and the GAL's ultimate recommendation as to what is in the best interest of the child or children at issue. Uniform Superior Court Rule 24.9 (7). And, that is precisely what the superior court permitted. Contrary to Harris's contention, the court did not terminate her cross-examination of the GAL. In fact, it expressly told Harris's counsel, "you can go into the factual basis," and counsel continued the cross-examination of the GAL.[2]

2. Harris next contends that the superior court erred by misapplying the legal standard for awarding custody of a minor child to a third party rather than the biological parent in that the recommendation of the GAL, which the superior court adopted, was based upon educational, social, financial, and moral advantages that the GAL perceived to exist in the grandparents' home.

Certainly, as Harris maintains, a parent has a right of custody to her child in preference to a third party unless there is clear and convincing evidence that the parent is unfit. *Wade v. Wade*, 272 Ga. 526, 527 (1) (531 SE2d 103) (2000). The focus of such a determination of unfitness must be the parent's ability to provide for the child in a manner sufficient to preclude the need for an entity of the government to intervene and separate the child from the parent, and a court is not permitted to terminate a parent's natural right to custody merely because it believes that the child might have better financial, educational or moral advantages elsewhere, that is, the parent's ability to raise her child is not to be compared to the fitness of a third person. Id. OCGA § 19-7-1 (b.1) required the grandparents in this case, as the third parties seeking custody, to prove by clear and convincing evidence that their grandson would suffer physical or

---

[2] Although not enumerated as error, in argument, Harris also complains that the superior court allowed the GAL to cross-examine her on the stand and to make argument regarding the GAL's recommendation. However, as acknowledged by Harris, Uniform Superior Court Rule 24.9 (7) provides that the GAL may question witnesses or present argument when there are exceptional circumstances and with the approval of the trial court, which was obviously the situation found in the present case.

emotional harm if custody were awarded to the biological parent, and once this evidentiary showing was made, then the grandparents had to further demonstrate that an award of custody to them would best promote the child's welfare and happiness.[3] *Clark v. Wade*, 273 Ga. 587, 599 (V) (544 SE2d 99) (2001). And, this they did.

As the superior court expressly outlined in its denial of a new trial, there was clear and convincing evidence that the child would suffer physical and emotional harm if placed with either biological parent, and Harris in particular. The record supports the following findings. The decree terminated the seven-year marriage between Harris and Snelgrove, who was Harris's fourth husband; Harris has five sons from three of her husbands, and R. A. S. is significantly younger than his four half-brothers; Harris met Snelgrove, who is 14 years her junior, when he was her oldest son's friend and roommate; Harris became pregnant with R. A. S. prior to her divorce from her third husband but there is no dispute that Snelgrove is the boy's biological father; the boy lived in Harris's household with three of his older brothers; there were illegal drugs in the home; there was evidence of alcohol abuse in the home; Harris admittedly purchased alcohol for consumption by at least one of her sons who was under age 21; some of the brothers had been arrested on multiple charges; there was a drug raid in the home during which Harris and Snelgrove and R. A. S.'s siblings were handcuffed in the presence of the little boy; Harris was arrested incident to the raid; R. A. S. had been required by Harris to provide his urine so that either a family member or friend could pass a court-ordered drug test; there were significant violent episodes in the home, including incidents among the older boys and between Harris and an older son, which resulted in Harris sustaining a "black eye"; Harris violated a safety plan in regard to R. A. S. which was initiated by the Georgia Department of Family and Children Services ("DFACS"); the little boy was absent for at least 29 days in the first four months of kindergarten, and the given reason for the excessive absences was that the boy was sick, although he was not taken to a physician; the household including the young boy kept very late hours, so the child was physically exhausted in the instances when he did attend school; people were in and out of the house at all hours of the night; the boy did not routinely have a bed available to him and often attempted to sleep on the living room couch; because the boy's truancy became an issue, Harris withdrew him from school and represented that she was home schooling him, although she herself dropped out of high school

---

[3] Snelgrove, who is the child's biological father, does not contest the custody award to his parents, and has joined them in filing a consolidated brief in this appeal.

prior to graduation; it was plain that there was no effort by Harris to academically instruct the boy, and that his siblings did his tests for him; when the boy was returned to school for the second grade, testing showed that he was a year and a half behind; even though the boy did not have a reading disorder, he could not read basic words as a child would at the beginning of first grade; he appeared to have low self-worth; the boy received help from principals, teachers, and volunteer parents, but Harris did not attempt to help her son in the effort; only one of Harris's older sons remained consistently enrolled in school, and none went on to attend college; at various times Harris was involved in numerous money making enterprises and schemes, including running and operating a commercially successful puppy mill which she promoted on the internet, and which served an international clientele; Harris removed from her name and placed in the names of her sons all assets, including homes, vehicles, bank accounts, and ownership of the pedigree dogs in obvious attempts to become judgment proof and obtain various forms of government assistance; she filed multiple petitions for bankruptcy; the record is replete with instances of Harris's prevarications and attempts to manipulate people and events to her advantage. And there was ample evidence to support an award of custody to the grandparents based on the best interest of their grandson, including that the grandfather and grandmother are both retired from gainful employment, respectively from the United States Postal Service and working as a school paraprofessional; they had extensive contact with the boy but without custody were powerless to change his situation; under a temporary court order, the child has spent considerable time in their custody and they have worked with the school to improve the boy's situation; though they are not of great means, they provide the child with a stable and nurturing environment which promotes his health and welfare; his self-confidence has improved; and he has not been sick while in their care.

3. Harris claims that the superior court erred by determining her gross monthly income to be $5,000 in its calculation of her child support obligation because there was no evidence to support this high an amount; she urges that rather the evidence showed her gross monthly income to be approximately $2,300, that the court arbitrarily arrived at a figure of $5,000 per month, and there was no credible evidence to suggest that she actually earned that amount or had the ability to earn that amount. But, that is far from the case.

As Harris acknowledges, in certain circumstances, a party's earning capacity rather than gross income may be used to determine child support, and a party's past income should be considered along with other relevant circumstances, including any specialized training or skill, any evidence of the suppression of income, assets and

liabilities, and the existence of other available funds in reaching the determination. *Herrin v. Herrin*, 287 Ga. 427, 428 (696 SE2d 626) (2010). There is evidence to support the superior court's implicit finding that Harris had purposefully attempted to hide her assets by placing them in the names of her children, including the minor son at issue. Indeed, as has been noted, it was determined that Harris had attempted to divest herself of title to her assets; she put title to her car and ownership of her bank accounts in the names of her children, and titled her house in her eighteen-year-old son, who had no visible means of support. The court further found that for a living, Harris raised registered pedigree dogs, and that ownership of all the dogs was in the names of her children, including the little boy; that although a non-lawyer, Harris prepared and charged for preparing bankruptcy petitions, child support work sheets, and articles of incorporation. Although the court found Harris's exact amount of income difficult to discern, it determined from all the relevant circumstances, including her expenses and the fact that Snelgrove did not work when he lived in the home, that she must have had a minimum income of $5,000 a month, and was capable of earning substantially more than that. Indeed, the superior court considered admitted evidence from Harris's own e-mail, which Harris was asked to read to the court while she was on the stand. In an e-mail to a former friend and sometime client, Harris was lamenting Snelgrove's loss of a job, and she related, inter alia, that "[her] money" included $1,350 per month in child support for one of her other sons, $1,000 a month payment from her father's estate, plus at least $4,000 to $10,000 a month from selling puppies; she stated that she had netted at least $80,000 to $120,000 per year for the past three years just from the dogs, "so that [with] the other $2,350 times twelve months, is anywhere from $108,000 to $105,000 plus."

4. Finally, there is no merit to Harris's remaining complaint that the superior court erred by ordering her to pay $20,000 to Snelgrove as an equitable division of property. The gravamen of her argument is that the award was improper because neither she nor Snelgrove acquired the marital residence, upon which the award was based, during the marriage nor did they own an interest in it in that Harris's son owned the house, and she and Snelgrove were merely tenants. She further urges that there was no evidence that Snelgrove's labor increased the value of the home, or that his labor was worth $20,000.

First, as previously noted, the clear inference from the findings of the superior court is that title to the residence in Harris's teenage son was a sham. But, even more significantly, the $20,000 award to Snelgrove was made as "an equitable division of all the marital estate." In determining how the marital estate should be equitably apportioned, the superior court, as the finder of fact in this case, was

authorized to consider the contribution or service of each spouse to the family unit. *Moore v. Moore*, 249 Ga. 27, 28 (3) (287 SE2d 185) (1982). And, there was ample evidence of Snelgrove's time and labor spent on extensive work on the parties' residence such as would justify the award of $20,000 to Snelgrove as his equitable share of the marital estate.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 21, 2011.

*Dupree & Kimbrough, Hylton B. Dupree, Jr., Blake R. Carl*, for appellant.

*Linda W. Gettle, F. Marian Weeks, Michael J. Kramer, Hill-MacDonald, Vic B. Hill, Brad E. MacDonald*, for appellee.