**THIRD DIVISION
ANDREWS, P. J.,
DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/**

**June 28, 2013**

# In the Court of Appeals of Georgia

A13A0326. MAULDIN v. MAULDIN et al.

MCMILLIAN, Judge.

Elizabeth Mauldin, pro se, appeals the final order entered by the superior court awarding joint legal custody of her daughter, O. M., to the child's father, Russell Edward Mauldin, and paternal grandparents, Ronald and Pat Mauldin, with primary physical custody to the grandparents. We affirm for the reasons set forth below.

Generally, "[a]ny change in custody is subject to the trial court's discretion based on the best interests of the child. We view the evidence in favor of upholding the trial court's order and will affirm if there is any reasonable evidence to support the decision." (Citations omitted.) *Fifadara v. Goyal*, 318 Ga. App. 196, 197 (733 SE2d 478) (2012). In this case, however, because the superior court placed joint legal and primary physical custody in the grandparents, and not the mother, the evidence

supporting the decision must be clear and convincing. *Clark v. Wade*, 273 Ga. 587, 599 (IV) (544 SE2d 99) (2001).

The mother and father were married in 2001; their daughter, O. M., was born in February 2002; and they were divorced in 2003. The divorce and custody agreement, as subsequently modified, apparently awarded the mother primary custody of O. M. and granted the father visitation rights. On July 29, 2008, the father filed a "Petition to Modify Parenting Time and Child Support," seeking to increase his visitation with O. M. and to decrease his payment of child support. The mother, who was represented by counsel in the proceedings below, opposed the petition and filed a counterclaim for contempt based upon the father's failure to comply with the terms of the divorce decree, including the failure to pay child support. In February 2010, the father filed a motion for contempt based upon the mother's failure to appear or produce O. M. at the time of his scheduled visitation. The superior court ordered the parties to mediation, which was unsuccessful, but the mother and father subsequently reached a preliminary agreement on visitation, and on April 26, 2010, the superior court issued an order memorializing that agreement "pending the outcome of [the

mother's] petition filed in the Juvenile Court of Murray County" to terminate the father's parental rights.[1]

The paternal grandparents subsequently filed a motion to intervene in the action, seeking custody of O. M. The mother apparently filed a motion opposing the intervention, although it does not appear in the record, but she failed to appear at the hearing on the issue. Following that hearing, on June 29, 2010, the trial court entered a temporary order, granting the paternal grandparents' motion to intervene and placing O. M. in their sole legal and physical custody. Approximately ten days later, Bobby Lee and Peggy Louise Humble, O. M.'s maternal grandparents, filed their own petition to intervene, seeking custody of the child. The superior court later granted the request to intervene, but maintained custody in the paternal grandparents. On August 3, 2010, the superior court appointed a guardian ad litem to represent O. M.'s interest in the proceedings.

During a second court-ordered mediation, the parties reached an agreement regarding certain issues, but the custody issue remained unresolved. At a subsequent hearing on August 18, 2011, the parties announced their agreement to submit the

---

[1] The record reflects that the mother filed her termination petition on April 5, 2010.

issue of custody to the superior court on stipulated evidence, along with an ex parte interview of the child by the trial judge, in lieu of an evidentiary hearing. The superior court issued its final order granting custody to the paternal grandparents and the father, with visitation to the mother, based on this evidence.

In the mother's initial appeal of this order, this Court was unable to determine whether the appellate record contained all of the stipulated evidence and accordingly remanded the case to the superior court for completion of the record. Following remand, the superior court held a hearing to show the parties the court's proposed supplement to the appellate record and to ensure it was complete. In this appeal, the mother once again challenges the superior court's final custody order.[2]

1. The mother asserts that the superior court erred in exercising jurisdiction in this case in light of the pending termination proceeding before the Murray County Juvenile Court.

---

[2] The mother's appellate brief raises a number of enumerations of error, but it does not comply with Court of Appeals Rule 25 (c) (1), which states that "[t]he sequence of arguments in the briefs shall follow the order of the enumeration of errors, and shall be numbered accordingly." Rather, her brief consists of one long argument addressing many issues, some of which were raised in the enumerations and some of which were not. Nevertheless, the Court will attempt to address each of the errors enumerated to the extent they are supported by argument or citation of authority. See *Birchby v. Carboy*, 311 Ga. App. 538, 540 (1) (716 SE2d 592) (2011).

Under the Georgia Constitution, superior courts have "jurisdiction in all cases, except as otherwise provided in this Constitution." 1983 Ga. Const., Art. VI, Sec. IV, Par. I; *Brine v. Shipp*, 291 Ga. 376, 377 (1) (729 SE2d 393) (2012). Included in this expansive grant of authority is "original jurisdiction over contests for permanent child custody in the nature of a habeas corpus between parents, parents and third parties, or between parties who are not parents." (Citations and punctuation omitted.) *Stone-Crosby v. Mickens-Cook*, 318 Ga. App. 313, 314 (1) (733 SE2d 842) (2012). See also OCGA § 19-6-14 (superior court has jurisdiction to determine custody "until the final judgment in [a divorce] case").

In contrast, the Georgia Constitution grants courts of limited jurisdiction, including juvenile courts, only such jurisdiction as "provided by law." 1983 Ga. Const., Art. VI, Sec. III, Par. I. And under OCGA § 15-11-28 (a) (1) (c), juvenile courts are granted "exclusive original jurisdiction" over an action in which a child "is alleged to be deprived," which jurisdiction encompasses an award of temporary custody of a child who is adjudicated deprived. *Ertter v. Dunbar*, 292 Ga. 103, 104-105 (734 SE2d 403) (2012). Under certain circumstances, therefore, a juvenile court and a superior court may share concurrent jurisdiction over the temporary custody of children. See *Long v. Long*, 303 Ga. App. 215, 218 (2) (692 SE2d 811) (2010). But

juvenile courts "[do] not have the authority to award permanent custody without a transfer order from a superior court. OCGA § 15-11-28 (c) (1)." *Ertter v. Dunbar*, 292 Ga. at 105. The record in this case contains no order transferring the issue of custody to any juvenile court; therefore, the superior court retained and properly exercised its jurisdiction to award permanent custody of O. M.[3] See also *Stone-Crosby v. Mickens-Cook*, 318 Ga. App. at 314 (1) ("even when a termination petition is brought in the juvenile court, if it is merely a 'disguised custody matter' it is not within the [juvenile] court's jurisdiction") (citation omitted).

2. The mother also raises a number of issues regarding the stipulated evidence considered by the superior court in issuing its final order.

(a) The mother first asserts that the superior court erred by rendering a ruling based on documents "not recorded in the superior court" before it issued its final decision. She asserts that no "substantiating evidence" exists to demonstrate that the superior court had possession of these documents before it ruled.

---

[3] Moreover, we note that the mother consented to the submission of the custody issue to the superior court at the August 18, 2011 hearing. At that hearing, her counsel stated that the parties were "ready for a resolution," and "everybody here wants to move forward. I mean, we're willing to proceed . . . ."

But the record is clear that the parties, including the mother, agreed at the August 18, 2011 hearing to stipulate to the admission of certain evidence, including doctors' reports and notes, a video deposition of one of the doctors, school records and the guardian ad litem's report. Some of this evidence was not available at the hearing, and the superior court asked the parties to provide the additional evidence in an expedited manner. The superior court also indicated that all of the parties should get copies of this evidence, so that "everybody know[s] what the Court is looking at." Although these documents were not formally marked for admission into evidence at that time, the parties were in agreement that the documents were to be submitted as evidence for the superior court to consider in issuing its ruling.

Following this Court's remand of the original appeal, the superior court invited the parties to review and confirm the stipulated documents the court intended to submit as part of the appellate record. The documents were marked as separate exhibits at that time and paginated for inclusion in the appellate record. The superior court stated on the record that the supplemented documents were those submitted by the parties and considered by the court. Moreover, the superior court clarified that it considered only the actual records and not any attorney-prepared summaries in issuing its final order. The mother, who was representing herself pro se, had the

7

opportunity to review the documents prior to their submission to this Court. The record does not indicate that she, or any other party, raised any formal objection to the superior court's proposed submission. Moreover, the mother does not identify any particular omissions or inclusions in the appellate record that do not accurately reflect the documents considered by the superior court. Accordingly, we find no error.

(b) The mother also argues that the superior court erred in relying upon this stipulated evidence because it was hearsay. But by stipulating to the admissibility of the documentary evidence, the mother induced any error and cannot complain that the evidence was hearsay. *Haralson v. Moore,* 236 Ga. 131, 132 (2) (223 SE2d 107) (1976). See also OCGA § 15–11–56 (a) ("in all proceedings involving custody of a child, all information helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent" in a hearing).

(c) The mother further asserts that the superior court erred in allowing any reference in the stipulated evidence to Parent Alienation Syndrome because she asserts that it is an unfounded and scientifically invalid theory not recognized by the American Psychiatric Association. But the mother not only failed to raise this argument below, she stipulated to the admissibility of the reports and video

8

deposition that reference this syndrome. And as previously noted, she "cannot now complain of a result [she] aided in causing . . . ." (Citation and punctuation omitted.) *Camp Cherokee, Inc. v. Marina Lane, LLC*, 316 Ga. App. 366, 371 (2) (729 SE2d 510) (2012).

3. The mother contends that the superior court abused its discretion in awarding custody of O. M. to the father and paternal grandparents without finding that she was unfit and in so doing, the court violated her constitutional rights as a parent.

(a) The mother is correct that "a parent has a right of custody to her child in preference to a third party unless there is clear and convincing evidence that the parent is unfit." (Citation omitted.) *Harris v. Snelgrove*, 290 Ga. 181, 182 (2) (718 SE2d 300) (2011).[4] And

> [t]he focus of such a determination of unfitness must be the parent's ability to provide for the child in a manner sufficient to preclude the need for an entity of the government to intervene and separate the child from the parent, and a court is not permitted to terminate a parent's natural right to custody merely because it believes that the child might

---

[4] We note, however, that no finding of parental unfitness was required for placing the child with the father in lieu of the mother. *Rowden v. Rowden*, 290 Ga. 65, 66 (1) (717 SE2d 469) (2011). But because the paternal grandparents were awarded both joint legal custody and sole physical custody of O. M., we analyze this case as a third-party custody dispute.

9

have better financial, educational or moral advantages elsewhere, that is, the parent's ability to raise her child is not to be compared to the fitness of a third person. [Cit.] OCGA § 9-7-1 (b.1).

Id. at 182 (2). A finding of parental fitness is restricted to a consideration of "the parent's present fitness," and a court may not rely "on evidence of the parent's past unfitness or compare the parent's ability to raise the child with the superior fitness of a third person." (Citations omitted.) *Clark v. Wade*, 273 Ga. at 591 (II).

In Georgia, custodial disputes between a parent and a third-party relative are governed by OCGA § 19-7-1 (b.1), which establishes "a rebuttable presumption that it is in the best interest of the child or children for custody to be awarded to the parent or parents of such child." Our Supreme Court has determined, however, that three presumptions are actually implicit in the statute: "(1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the custody of a parent." *Clark v. Wade*, 273 Ga. at 593 (II). The Supreme Court has held, however, that a third-party relative can overcome these presumptions by showing by clear and convincing evidence, that parental custody would result in harm to the child, i. e., "either physical harm or significant, long-term emotional harm," not "merely social or economic disadvantages." Id. at 598

10

(IV). Once a third-party relative has overcome the presumption, he or she must further prove "that an award of custody to him or her will best promote the child's health, welfare, and happiness." Id.

*Clark v. Wade*, which was a plurality decision, originally applied this standard in two cases involving parental reunification, i. e., where a non-custodial parent sought to regain custody from custodial third parties. 273 Ga. 587. Here, the mother cites Justice Sears' concurring opinion in *Clark*, in which she distinguished reunification cases from those "in which a third party seeks to break apart an intact parent-child relationship by seeking custody of a parent's child." Justice Sears urged the application of an "even more stringent standard" in the latter cases, stating that "[i]n such 'removal' cases, only the traditional parental fitness test can be constitutionally applied, resulting in the removal of the children only when the parents 'are incapable of taking adequate care of their children.'" (Citations omitted.) Id. at 600-601. The mother urges us to adopt this purportedly higher standard of unfitness in this case.

In *Harris v. Snelgrove*, however, all seven justices of the Supreme Court equated the *Clark* "harm" standard with the parental unfitness standard in a removal case, in which the paternal grandparents intervened in the parents' divorce action to

obtain custody of their grandson. 290 Ga. at 182-183 (2). Thus, in Georgia, the *Clark* "harm" standard applies in both reunification and removal cases. Accordingly, "the appropriate standard of proof [in this case] is the 'best interest of the child' standard set forth in OCGA § 19–7–1 (b.1) as narrowly construed in *Clark* . . . to recognize parents' constitutionally protected interest in the care, custody, and management of their children."[5] *Lopez v. Olson*, 314 Ga. App. 533, 540 (3) (724 SE2d 837) (2012).

The superior court applied this standard in considering the custody of O. M. and also followed the Supreme Court's instruction that when "considering the issues of harm and custody, trial courts should consider a variety of factors that go beyond the parent's biological connection or present fitness to encompass the child's own needs." *Clark v. Wade*, 273 Ga. at 598 (IV).

> These factors should include: (1) who are the past and present caretakers
> of the child; (2) with whom has the child formed psychological bonds
> and how strong are those bonds; (3) have the competing parties

---

[5] "Parents have a constitutional right under the United States and Georgia Constitutions to the care and custody of their children. This right to the custody and control of one's child is "a fiercely guarded right that should be infringed upon only under the most compelling circumstances." (Citation and punctuation omitted.) *Clark v. Wade*, 273 Ga. at 596-597 (III). "Aligned against the parents' constitutional right is the child's constitutional right to protection of his or her person and the state's compelling interest in protecting the welfare of children." (Citations omitted.) Id. at 597 (III).

evidenced interest in, and contact with, the child over time; and (4) does the child have unique medical or psychological needs that one party is better able to meet.

(Citations omitted.) Id. at 598-599 (IV).

In applying these factors to the evidence of record, the superior court concluded, by clear and convincing evidence that, although both parents may be "teachable" and they mean well, "an award of custody to either parent is not in the child's best interest and that the statutory presumption in favor of the parents has been rebutted." In making that finding, the superior court necessarily found that the evidence rebutted the implicit presumption under OCGA § 19-7-1 (1.b) that the mother was a fit person entitled to custody. Accordingly, we interpret the superior court's order as making the necessary finding of parental unfitness as defined in *Clark v. Wade* and *Harris v. Snelgrove*.

(b) In support of this finding, the superior court found, in a very thorough and well-reasoned order, that O. M. had "significant mental health issues," and that it was "the consensus of the mental health professionals who had seen [the child] that many of her problems are the result of the extremely high conflict between Mother and Father." The court also found that the mother promoted this conflict "by her efforts

13

to alienate [O. M.] from the father and his family"; "failed to set limits or discipline" the child; or "to recognize and deal with the child's disruptive behavior." The mother denied the diagnosis of her daughter's condition, and neither parent followed early professional advice on behavior modification techniques for the child. The superior court further found that O. M.'s behavior continued to deteriorate while in the mother's custody. The court also found that mental health experts had "grave concern" for the child's future behavior and mental health if the child did not receive consistent and intensive therapy.

The superior court's analysis focused on two of the four *Clark* factors: the child's psychological bonds and the child's unique medical or psychological needs that one party is better able to meet. Although the court found that O. M. and her mother had a very strong bond, it noted one doctor's conclusion that it was not altogether a healthy bond. The court noted that "[a] strong bond would be a plus in most cases, but given Mother's manipulation of this child, her attempts to poison this child against Father and his family, and her failure to follow through on recommended behavior modification for this child, this bond has certain negative aspects." The superior court also addressed the fourth factor, noting the parents' failure to address the child's "unique and serious psychological needs" on a

consistent basis and found, "in fact, their actions contributed to making the situation worse."

We conclude that the superior court's findings are supported by clear and convincing evidence.

A review of the appellate record demonstrates that each of the therapists who evaluated O. M. diagnosed significant behavioral and emotional issues, and they all recommended continued, intensive therapy, including family therapy. Dr. David Stevens, who O. M. began seeing in 2003 when she was one year old, diagnosed her with Oppositional Defiant Disorder ("ODD") in November 2006, when she was just four years old. When she was seven, he added a diagnosis of Attention Deficit Hyperactivity Disorder (ADHD"). During the custody dispute, O. M. also began seeing Dr. Louisa Branscomb whose therapy focused on diagnoses of ODD, Intermittent Explosive Disorder ("IED"), Adjustment Disorder, with mood instability and problems with aggression, manipulative behavior, and impulsivity. Dr. Branscomb emphasized that "[O. M.] has a very severe and complex presentation of mental health problems, which are in large measure related to ongoing severe conflict in her family environment particularly as relates to custodial issues." She found that O. M.'s "level of problems in aggression and mood are severe." The doctor expressed

15

concern that the child's behavior could evolve into "frank Bipolar Disorder as well as possible personality disorder traits as she gets older." O. M. was also seen as part of a custody evaluation by Dr. William Hillner, who diagnosed her with ODD and Adjustment Disorder.

But, as the superior court found, the mother failed to take the child's behavioral issues seriously, denying Dr. Stevens' ODD diagnosis. Although the mother took O. M. for occasional psychotherapy visits with Dr. Stevens beginning in 2003, neither the mother or the father followed through on his early advice to address the child's behavioral issues. Dr. Hillner found that the mother and O. M. have an "enmeshed relationship," which is exacerbated by the fact that the mother allowed the child to sleep with her until the age of eight. He stated that O. M. seemed more regressive and immature with her mother. Additionally, the mother had difficulty identifying any weaknesses in O. M., and had an unwillingness to recognize her own faults.[6] She consistently blamed others for O. M.'s behavioral issues, taking no responsibility herself. For example, despite the consistent diagnosis of ODD, Dr. Hillner noted that the mother believes that O. M. is not oppositional all the time; rather, the mother

---

[6] In contrast, the mother could not identify *any* of the father's *strengths*, which Dr. Hillner described as a "serious liability" on the part of the mother.

thinks that she just has difficulty adjusting to boundaries, which the mother attributed to the custodial situation. Dr. Stevens also acknowledged that the mother's management and discipline skills could be improved, noting that the mother "let [O.M.] call the shots too much."

While in her mother's custody, O. M. exhibited numerous behavioral problems at school. On one occasion, when O. M. was seven, she threatened to stick a pencil in another child's neck and to kill her. O. M. received in-school suspension as a result of this incident, and a few months later, she received one day of out-of-school suspension for "being defiant." The mother complained to Dr. Stevens at the time of this incident that the teacher was too lenient and that the counseling advice she had received was not effective. Dr. Hillner noted that the mother did not take O. M.'s threats to harm the other child seriously and blamed the other student. Dr. Hillner observed that the mother smiled when she spoke of the incident. On another occasion when O. M. exhibited behavioral problems in school, the mother attributed the problems to "inherited traits" from the father, stating the father "does not want to [accept] responsibilities for [his] actions, just like [O. M.]."

Dr. William Walker, who was the mother's therapist for the three-month period immediately preceding the superior court's custody decision, agreed from

reading the other doctors' reports that the conflict between the parents was harmful to O. M., and that she received poor parenting from her mother and father "in ways that have hindered her development and security." He also agreed that the mother was over-nurturing, permissive and enmeshed with the child, so that she is overprotective and somewhat spoiled.

Dr. Hillner noted significant indications that the mother and her parents had alienated O. M. from the father and his family, including a lack of cooperation and inability to co-parent. He noted that O. M.'s comments regarding her father did not justify the level of hatred she appeared to have for him. Like the mother, she "could not identify a single positive quality associated with her father." These observations were confirmed by Dr. Branscomb. At one point during the custody dispute, the father and the paternal grandparents began supervised visitation after a nine-month period in which they claim the mother did not allow them to see O. M. According to the guardian ad litem's report, the director of the facility where these visits occurred testified at an earlier hearing that the visits went very poorly. He indicated that O. M.'s inability to visit with the father and his parents was the worst case he had ever seen. The mother's reaction to these problems was to recommend discontinuing visitation with the father or his family.

After the superior court transferred custody to the paternal grandparents, the maternal grandparents, with the mother's knowledge, circulated a "wanted"-style poster encouraging the public to look for O. M., which Dr. Hillner noted could cause "a serious incident" for the paternal grandparents.[7] Dr. Stevens also acknowledged that the mother had "made mistakes" in alienating O. M. against her father and noted that the child's relationship with her father has "major damage." He noted that the mother and O. M. "tend to feed off of each other in [a] negative way regarding [the father], resulting in [the] alienation of [the father], [which has not been] helped by [the father's] own behavior and inconsistent presence." Dr. Branscomb noted that O. M. felt torn between the two sides of her family and that she feels especially guilty when she says positive things about the Mauldins. She stated that, even putting the issue of parental alienation syndrome aside, any child will have difficulties reaching behavioral and emotional milestones if disparaging behavior or animosity existed between the parents. And with a child like O. M., who already had ODD and IED and was already polarized, such behaviors would only increase the likelihood that she would remain angry and unable to resolve her issues.

---

[7] They also appeared at the courthouse with a large sign on a pickup truck reading, "Justice for [O. M.]" and created a website with a similar tag line.

Accordingly, the evidence demonstrates that O. M. is a child with severe problems that the mother refused to acknowledge and failed to address. Although the record also shows that during supervised visitation, the mother followed professional parenting advice and attempted to behave in a more neutral fashion with regard to the father and his parents, the record contains no evidence demonstrating that the mother ever acknowledged the child's problems or her role in causing and perpetuating them, and thus as the superior court found, no evidence existed in the record that O. M.'s needs would be met if she were returned to her mother. Under these circumstances, we find that clear and convincing evidence supported the superior court's finding that the presumption in favor of parental custody had been rebutted.

4. The mother also contends that the superior court did not properly determine the best interests of the child, but instead ruled based on the court's prejudice against her, as evidenced by the court's finding in its June 29, 2010 order that "it is clear that the Mother hates the father more than she loves her child." We disagree.

The superior court based its conclusion that custody in the paternal grandparents would be in the best interests of O. M. on the parents' failure to meet O. M.'s needs. As the superior court noted, after the parental grandparents received custody, they immediately sought therapy for the child, consulted various therapists,

20

and implemented their advice. Their actions, along with the father's increased involvement and consistent discipline of O. M., resulted in some improvement in the child's behavior by the time of the court's decision. Acknowledging that the therapists believe that substantial work remained for O. M., the superior court found that only the paternal grandparents "have shown both the will and the ability to meet [O. M.'s] needs." The superior court also found no evidence that if the child were returned to the mother that these needs would be met because the mother denied the diagnosis of her child's condition and failed to take responsibility for the role her own actions played in O. M.'s problems.

The record shows that after the paternal grandparents received custody, Dr. Branscomb noted that O. M.'s behavior improved with more visitation from her mother, with her father more involved in the discipline and the setting of limits, with his spending time with her, and with medication. She observed in March 2010 that although the child enjoyed spending time with her father, she still showed a lack of attachment to him, indicating that their relationship still needed a lot of work. Additionally, she indicated that O. M. had a very long way to go with her therapy, noting that she was "still quite a disturbed child." Dr. Hillner agreed that O. M.'s problems required continued treatment. Dr. Branscomb said O. M. had enormous

potential, describing her as funny, bright, creative, and insightful, but she noted that O. M. has severe problems that cannot easily resolve if the animosity in her family continued. Thus, a stable, neutral environment was extremely important for O. M. Dr. Branscomb explained that O. M. was struggling to get out of the middle of the family conflict and that the parties should do anything they can to reduce this conflict and to promote a more cooperative, positive environment for the child. The other therapists agreed and made recommendations that O. M., and her family, continue therapy.

Accordingly, in determining the best interests of the child, the superior court had to consider who among the parties would be more likely to provide O. M. with the environment and consistent treatment she needed. Although the therapists recommended against removing O. M. from her mother's custody,[8] the trial court was not required to adopt their recommendations. And, in fact, the guardian ad litem recommended against awarding custody to the mother given her unwillingness to

---

[8] Due to the strong enmeshed nature of the relationship between the mother and O. M., Dr. Hillner expressed concern that separating the two might cause the child significant trauma; nevertheless, he said he had serious concerns about the mother. Dr. Hillner recommended split custody between the mother and the paternal grandparents. Dr. Walker recommended working toward joint custody between the mother and the grandparents. Dr. Stevens advised against and disapproved of the superior court's decision removing the child from her mother's custody.

cooperate with the father and his family and her lack of understanding with regard to O. M.'s diagnoses and need for therapy.

Based upon our review of the record and the arguments of the parties, we conclude that the record contains clear and convincing evidence to support the superior court's finding that the child's best interests would be served by the custody arrangement it adopted. Thus, we conclude that the superior court's decision was based on the evidence and was not the result of any prejudice against the mother.

*Judgment affirmed. Andrews, P. J., concurs. Dillard, J., concurs fully in Divisions 1, 2, 4 and in judgment only as to Division 3.*

A13A0326.  ELIZABETH  MAULDIN  v.  RUSSELL  EDWARD

    MAULDIN et al.

    DILLARD, Judge, concurring in judgment only.

    I concur in judgment only as to Division 3 of the majority opinion because I do
not agree with all that is said by the Court in that division of the opinion.  As such,
Division 3 of the majority's opinion may not be cited as binding precedent in future
cases.  *See* Court of Appeals Rule 33 (a).