**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 30, 2015**

# In the Court of Appeals of Georgia

A14A1826. In the Interest of C. A. J., a child.

BOGGS, Judge.

In this private deprivation action brought by the maternal grandmother of 9-year-old C. A. J., the trial court found the child to be deprived and placed her in the permanent custody of the grandmother.[1] For reasons that follow, we affirm the deprivation determination, but we are constrained to reverse the permanent custody award, and therefore remand for further proceedings.

1. On appeal from a deprivation finding, we construe the evidence favorably to the juvenile court's ruling and determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. See *In the*

---

[1] In its order, the juvenile court also denied the putative father's petition to legitimate C. A. J. That ruling is not at issue in this appeal.

*Interest of M. M.*, 315 Ga. App. 673, 676 (2) (727 SE2d 279) (2012). This Court does not weigh the evidence or resolve issues of witness credibility. Id. Rather, we defer to the juvenile court's fact-finding and "affirm unless the appellate standard is not met." Id.

So viewed, the record shows that the mother and C. A. J.'s putative father had a volatile relationship that involved frequent fighting, verbal abuse, and physical confrontations. The two never married, but they lived together following C. A. J.'s birth at various residences in Georgia and South Carolina. At some point while the mother and father were together, the mother entered into a romantic relationship with the father's brother, Phillip Jones. When the father found out about the affair, he warned the mother not to expose C. A. J. to Jones, who had previously been convicted of child molestation.

In May 2011, the mother ended her relationship with the father and moved into her parents' home with C. A. J., who was then five years old. The mother continued seeing Jones following the move, spending the majority of her time at his residence while C. A. J. remained at the grandparents' home. According to the grandmother, the mother's personal possessions were at their home, but the mother "was never

physically" there. The mother subsequently married Jones and became pregnant with his child. C. A. J., however, remained with her grandparents.

On November 1, 2011, the mother visited her parents' home and had a heated argument with the grandmother in front of C. A. J. While C. A. J. watched, the mother shoved the grandmother against a wall and threatened to remove C. A. J. from the home. Two days later, the grandmother filed a private deprivation petition alleging that the mother was unable to provide a stable home for C. A. J., was mentally incapable of caring for her, and had not supported her financially since leaving her with her grandparents. Through this petition, the grandmother requested legal and physical custody of C. A. J.

Following a December 2011 hearing, the juvenile court found C. A. J. to be deprived based on, among other things, the mother's failure to protect C. A. J. from exposure to domestic violence; her relationship with Jones, a convicted child molester and registered sex offender; and her decision to permit interaction between Jones and C. A. J. The juvenile court awarded temporary custody to the grandmother and entered a concurrent plan of reunification and non-reunification. It also developed reunification case plan goals that required the mother to obtain a psychological

3

evaluation and follow all treatment recommendations; demonstrate an ability to protect C. A. J. from domestic violence and sexual abuse; and pay child support.

The mother submitted to a psychological evaluation on January 30, 2012, and the evaluating psychologist recommended that she take part in counseling. The mother commenced counseling the following May with goals to evaluate her relationship with Jones and address how she could keep C. A. J. safe from the risk he posed as a sex offender. In the meantime, C. A. J. also began therapy. According to C. A. J.'s therapist, the child immediately indicated that she liked living with her grandparents because her parents often fought, which she found distressing. She also reported that she was afraid of Jones, who was mean to her and watched her while she undressed.

In April 2012, the grandmother informed C. A. J.'s therapist that C. A. J. had been "very agitated" after returning from a recent visit with the mother. C. A. J. subsequently told the therapist that during the visit, Jones stated that he loved her, sat her on his lap, kissed her on the lips, and placed his hands inside her thighs. Believing that C. A. J. had disclosed an incident of molestation, the therapist reported the outcry to the Department of Family and Children's Services ("DFACS"). Jones was arrested in May 2012, and, based on C. A. J.'s initial outcry as well as disclosures in other

4

interviews, he was charged with aggravated child molestation and child molestation. Shortly after Jones's arrest, the juvenile court suspended all contact between the mother and C. A. J., citing the mother's failure to protect her daughter from Jones, her assertions in court that Jones was innocent and that C. A. J. had lied about the molestation, and the possibility that she might try to influence C. A. J.'s testimony.

According to the grandparents, the mother made little effort to check on C. A. J.'s well-being after the juvenile court suspended contact. She also offered minimal financial support for C. A. J., making only one of the monthly child support payments required by her case plan goals.

At an October 2012 evidentiary hearing, the mother testified that, through counseling, she had learned that she needed to end her relationship with Jones to protect her daughter. But she admittedly maintained contact with Jones following his May 2012 arrest, visiting him in jail, writing him letters, and speaking with him by telephone. She asserted, however, that she had recently "separate[d]" herself from Jones. According to the mother, she no longer communicated with or visited him, and she informed him in August 2012 that she wanted a divorce. Nevertheless, she had not commenced divorce proceedings at the time of the hearing, and less than one month before the hearing, she told Jones over the telephone that she loved him.

5

The mother further claimed that the grandmother is controlling and manipulative, and that the grandfather sexually abused her when she was five years old. The abuse allegations, however, were investigated by DFACS after the mother made an outcry to a teacher, and the grandfather was not arrested or charged with a crime. The mother also told an evaluating psychologist that she had never been abused as a child, and she requested that the grandfather accompany C. A. J. on supervised visitations. Moreover, significant evidence demonstrates that C. A. J. has thrived in her grandparents' care. The grandparents and other family members testified that the mother did not attend to the needs of C. A. J., who exhibited behavioral problems, had nightmares, and was withdrawn when she first came to live with the grandparents. But with the help of therapy and a stable environment, C. A. J. has adjusted well, is happy, and no longer displays aggressive behaviors.

Following the October 2012 hearing, the juvenile court once again deemed C. A. J. deprived based on, among other things, the mother's instability, her unresolved mental health concerns, her involvement with Jones, and her failure to meet C. A. J.'s emotional needs. We find no error.

A deprived child is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the

child's physical, mental, or emotional health or morals." Former OCGA § 15-11-2 (8) (A).[2] Deprivation is established through "'proof of parental unfitness arising from either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child.'" *In the Interest of W. W.*, 308 Ga. App. 407, 410 (707 SE2d 611) (2011). The ultimate issue in a deprivation petition is the child's welfare, not parental fault or who is responsible for the conditions resulting in deprivation. Id.

The evidence shows that the mother became romantically involved with and ultimately married Jones, a convicted child molester and registered sex offender, whom she permitted to interact with C. A. J. When C. A. J. reported that Jones had touched her inappropriately, the mother defended Jones and expressed disbelief about the outcry. Several family members testified that the mother showed little concern for C. A. J.'s needs while the child was in her care, and since May 2011, she has provided only minimal financial support. Moreover, after the juvenile court suspended

---

[2] In 2013, the General Assembly adopted a new Juvenile Code to replace Chapter 11 of Title 15 of the Georgia Code. Ga. L. 2013, p. 294, § 1-1. The new Juvenile Code went into effect on January 1, 2014, and applies to juvenile proceedings commenced on or after that date. Id. Because the proceedings in this case commenced before January 1, 2014, the former code applies here. See *In the Interest of S. R. R.*, __ Ga. App. __ n.5 (Case No. A14A1809, decided March 2, 2015).

visitation between the mother and C. A. J., the mother made no effort to contact her family about C. A. J.'s welfare. During this same time period, however, she frequently visited and communicated with her husband, who had been arrested for molesting C. A. J.

Given the circumstances, the juvenile court was authorized to find clear and convincing evidence that the mother's failure to protect C. A. J. from Jones, her neglect of C. A. J.'s mental and emotional needs, and her failure to financially support her child resulted in a lack of proper parental care and control. See *In the Interest of A. P.*, 299 Ga. App. 886, 889 (684 SE2d 22) (2009) (affirming deprivation finding based on clear and convincing evidence that mother did not fully appreciate what needed to be done to protect her daughter from sexual abuse by step-father); *In the Interest of T. J.*, 281 Ga. App. 308, 312 (1) (636 SE2d 54) (2006) (in case involving termination of parental rights, mother's failure to financially support child "weighed in favor of likely continued deprivation"). Indeed, we have held that the failure of a mother to protect her child from sexual abuse that occurred while in her care supports a finding that *termination of parental rights* was in the child's best interest. See *In the Interest of C-J. N.*, 289 Ga. App. 423, 427 (2) (657 SE2d 329) (2008). And as in that case, here the mother was specifically required to demonstrate an ability to protect C.

A. J. from sexual abuse as part of her case plan. See id. Nevertheless, a scant four months later, C. A. J. reported that Jones kissed her on the lips and placed his hands inside her thighs. And despite asserting that she had cut all contact with Jones, she continued to communicate with him following his arrest for those acts.

The record further demonstrates that the mother's actions have adversely impacted her daughter. C. A. J.'s behavior and social interactions improved when she came into her grandparents' care, and her grandfather testified that she has not exhibited aggression since the juvenile court suspended contact with the mother. In addition, C. A. J.'s therapist testified that C. A. J. does not feel safe with her mother, is in fear of Jones, and will need therapy "off and on for a long time."

We recognize that the mother offered contrary evidence at the deprivation hearing. She challenged the grandparents' fitness to care for C. A. J., testified that she had ended her relationship with Jones, and presented evidence that she was progressing in therapy. But "[i]t is the province of the juvenile court to weigh the evidence and determine its credibility." (Citation and punctuation omitted.) *In the Interest of W. W.*, supra, 308 Ga. App. at 410. And under these circumstances, the court was authorized to find C. A. J. deprived at the time of the October 2012

9

deprivation hearing. See id. at 410-411; *In the Interest of A. P.*, supra, 299 Ga. App. at 889; *In the Interest of T. J.*, supra, 281 Ga. App. at 312 (1).

2. After deeming C. A. J. deprived, the juvenile court entered its disposition, finding that reunification with the mother would be detrimental and that "placement" with the grandmother "for the purposes of adoption" is in C. A. J.'s best interest. Elsewhere in its order, the juvenile court made clear that by "placement," it meant "permanent custody . . . for the purposes of adoption."

Juvenile courts have exclusive original jurisdiction over deprivation actions. See *Ertter v. Dunbar*, 292 Ga. 103, 104-105 (734 SE2d 403) (2012); former OCGA § 15-11-28 (a) (1). In such cases, "the juvenile court may award temporary custody of [a] child adjudicated to be deprived." *Ertter*, supra at 105. Issues of permanent child custody, however, fall within the superior court's jurisdiction. See *Mauldin v. Mauldin*, 322 Ga. App. 507, 509 (1) (745 SE2d 754) (2013). A juvenile court, therefore, "does not have authority to award permanent custody without a transfer order from the superior court." *Ertter*, supra; see also *Mauldin*, supra; former OCGA § 15-11-28 (c) (1) (describing concurrent jurisdiction of juvenile court to hear custody cases "transferred by proper order of the superior court").

The record contains no evidence of a superior court transfer here. To the contrary, the grandmother commenced this proceeding in juvenile court as a private deprivation action. Accordingly, a permanent custody award was not within the juvenile court's jurisdiction. See *Ertter*, supra, 292 Ga. at 104-105; *Mauldin*, supra, 322 Ga. App. at 509 (1).

Moreover, we cannot construe the court's disposition as a grant of custody pursuant to former OCGA § 15-11-58 (i), which permits a juvenile court to place a deprived child with a willing relative until the child's eighteenth birthday. See former OCGA § 15-11-58 (i) (1) (A). As explained by our Supreme Court, such placement does *not* constitute permanent custody. See *Ertter*, supra, 292 Ga. at 105 ("The juvenile court's authority to place a child in the custody of a 'willing and 'qualified' relative is not authority to award permanent custody of the child."). And long-term placement under former OCGA § 15-11-58 (i) (1) is only appropriate "if the court finds that referral for termination of parental rights and adoption is not in the best interest of the child." The juvenile court explicitly granted the grandmother

11

"permanent custody" for purposes of adoption, removing this case from the placement provisions in former OCGA § 15-11-58 (i) (1).[3]

The juvenile court lacked authority to grant the grandmother permanent custody over C. A. J. for purposes of adoption. See *Ertter*, supra; *Mauldin*, supra; see also former OCGA § 15-11-58 (o) (2) (describing placement options that juvenile court may consider during permanency hearing). The custody award, therefore, cannot stand. We are therefore constrained to reverse the juvenile court's custody disposition and remand for further consideration of all custody issues in light of this court's affirmance of the finding of deprivation.

*Judgment affirmed in part, reversed in part, and case remanded. Barnes, P. J., and Branch, J., concur*.

---

[3] Similarly, there is no argument that the juvenile court appointed the grandmother as C. A. J.'s permanent guardian under former OCGA § 15-11-30.1 (a) (2). Neither the deprivation petition nor the court's order references guardianship, and the order does not meet the statutory requirements for appointing a permanent guardian. See former OCGA § 15-11-30.1 (a) (2) (C) (permanent guardianship orders must establish reasonable visitation schedule or specifically include any restriction on parent's right to visitation). Furthermore, long-term guardianship is only appropriate where termination of parental rights and adoption are not in the child's best interest. See former OCGA § 15-11-30.1 (a) (2) (A) (ii).