**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**August 3, 2016**

# In the Court of Appeals of Georgia

A16A1239. HOLDAWAY v. HOLDAWAY.

BARNES, Presiding Judge.

The father, Owen Lee Holdaway, filed a child custody modification action against the mother, Bobbi Sue Holdaway, seeking primary custody of their daughter, L.H. The maternal grandmother, Terry Jo Stewart, filed a motion to intervene in the custody modification action, seeking custody of the child or, in the alternative, visitation rights. The trial court granted the grandmother's motion to intervene, and, after conducting a bench trial, the court awarded the grandmother custody of the child and awarded the father visitation. On appeal, the father challenges the trial court's award of custody to the grandmother, contending that there was insufficient evidence that the child would be harmed if placed in his custody, and that the court applied the wrong legal standard under our Supreme Court's recent decision in *Stone v. Stone*, 297 Ga. 451 (774 SE2d 681) (2015). For the reasons discussed below, we affirm.

Following a bench trial in a child custody case, we view the evidence in the light most favorable to the trial court's decision. *Strickland v. Strickland*, 298 Ga. 630, 633-634 (1) (783 SE2d 606, 610) (2016). So viewed, the record reflects that the mother and father were married in 2007 when they were 20 years old. Shortly after the mother and father were married, their daughter L.H. was born. L.H. was eight years old at the time of the bench trial.

L.H. has a sister who is approximately one year older than her. The older sister has the same mother but a different biological father than L.H. and was around six-months old at the time of the 2007 marriage. It is undisputed that the father in this case has no legal custodial rights over the older sister.

In 2009, the mother and father divorced. Under the terms of the divorce agreement entered into by the parties and incorporated into the final judgment and decree of divorce, the mother and father shared joint legal custody of L.H., with the mother receiving primary physical custody and the father receiving visitation. The divorce agreement did not contain any provisions applicable to L.H.'s older sister.

Shortly after the divorce, the mother, L.H., and L.H.'s older sister moved into the home of the maternal grandparents. The maternal grandmother became the

primary caregiver of the children and developed a strong bond with them. The maternal grandmother also became the legal guardian of L.H.'s older sister.

In the years after the divorce, the mother suffered problems with drug and alcohol addiction, was admitted into an in-patient substance abuse rehabilitation program, spent time in jail, and had two more children with different fathers. The mother lived with the maternal grandparents only sporadically, while L.H. and her older sister remained in the continuous care of the maternal grandmother. The mother provided no financial support for the children and did not see them consistently.

The father acquiesced to the maternal grandmother serving as the primary caregiver of L.H. because he believed that the grandmother provided a more stable environment for the children than the mother, and his erratic employment situation prevented him from having L.H. live with him. The father exercised visitation with L.H., but not to the full extent authorized by the divorce agreement. He also maintained contact with L.H.'s older sister, who would join L.H. when she had visitation with the father. The father did not consistently pay his child support on time or provide health insurance for L.H. as required by the divorce agreement.

In 2014, following a dispute over summer visitation, the father filed a petition to modify child custody against the mother in which he sought primary physical

custody of L.H. The maternal grandparents stopped permitting the older sister to join L.H. on her weekend visits with L.H.'s father from that point forward.

The maternal grandmother filed a motion to intervene in the child custody modification action, seeking custody of L.H. or, in the alternative, visitation rights.[1] The trial court granted the grandmother's motion to intervene, and a two-day bench trial was conducted in 2015.

At the bench trial, several witnesses testified about the uncharacteristically close relationship between L.H. and her older sister, and about the strong bond between the maternal grandmother and the two sisters that had developed after many years of living together. One witness, a retired school teacher and friend of the maternal grandmother, testified that L.H. and her older sister were extremely close, much more so than most children their age, and that the grandmother was "the stabilizing force in those girls['] lives." Another friend of the maternal grandmother testified that L.H. and her sister are "Super Glued together and when they're apart, they're miserable."

---

[1] The father maintains that the maternal grandmother only moved to intervene so as to obtain visitation rights with L.H. pursuant to OCGA § 19-7-3, but the grandmother's motion stated in the alternative that she was seeking custody of L.H., which fell under the statutory framework of OCGA § 19-7-1 (b.1), as discussed supra.

Additionally, the sisters' uncle testified that the sisters are closer than most siblings and are together most of the time, that the grandmother had raised the two sisters as her own daughters, and that it would be wrong to remove L.H. from the home of her older sister and grandmother with whom "she's got such a strong bond." The maternal grandfather similarly testified that the sisters are like "Frick and Frack" because "they are tight, tightest sisters," and described L.H.'s relationship with her maternal grandmother as being "like Velcro. . . . [W]herever [the grandmother] goes, [L.H.] goes." The grandfather further testified that it would emotionally harm L.H. to be separated from the household of her sister and grandmother.

The mother testified at the bench trial as well. She described the maternal grandmother as "the rock, the foundation for those kids." In discussing the relationship between L.H. and the older sister, the mother testified, "I cannot imagine . . . moving both or either one of them without causing some sort of emotional turmoil," and described them as being "like two pieces in a puzzle that fit together." The mother referred to the maternal grandparents as the sisters' "solid foundation," and noted that the sisters "are each other's foundation as well," given that [t]hroughout their entire li[ves], the one thing that has remained stable . . . is that they were together."

5

The maternal grandmother also testified at the bench trial. She testified that L.H. and her older sister are extremely close, to the extent that they sleep together in the same bed every night, that they "thrive on each other," and that it would hurt them to be separated from one another. According to the maternal grandmother, "emotionally it's going to kill them" if the two sisters were separated from the same household, and L.H. would suffer emotional harm if primary physical custody was granted to the father. The maternal grandmother further testified that L.H. went to a great elementary school and had good friends and indicated that those aspects of her life would be entirely disrupted if she were removed from her current home. Additionally, the grandmother testified that L.H. had become more quiet and withdrawn since this litigation began and that she was currently taking L.H. and her older sister to a counselor.

When the father testified at the bench trial, he noted that the maternal grandparents had been a source of stability for L.H. and her sister and that they provided the best home for the children after the divorce. He acknowledged the close relationship between L.H. and her older sister and testified that the older sister could visit as often as she wanted if he obtained primary custody of L.H., but he conceded that he had no legal custodial rights to the older sister. The father further testified that

6

he had lived at five different residences and had eleven different jobs since his divorce from the mother, and that his current job was only a month old. The father also conceded that he had not consistently paid his child support on time or provided health insurance for L.H. as required by the divorce agreement, although he was now current on his child support obligations and had health insurance in place for L.H. Additionally, the father testified that after the divorce, he had begun dating a 17-year-old high school student when he was 26 years old, and that he would not disapprove of L.H. having a similar relationship with an older man and believed that his relationship with the student provided a good model for L.H.

The father also called his girlfriend and his own father, i.e., the paternal grandfather, as witnesses at the bench trial. They both testified that the father is a capable and loving parent to L.H. and that it would be in her best interest to reside with him.

At the conclusion of the bench trial, the father requested that the trial court grant primary physical custody of L.H. to him and visitation to the maternal grandmother. The mother requested that the court grant primary physical custody of L.H. to the grandmother and visitation to the mother. The grandmother requested that

the court grant primary physical custody of L.H. to her and visitation to the father, but not the mother.

After hearing from the parties, the trial court ruled from the bench, finding that awarding physical custody of L.H. to the father or mother would "completely undermine the stability of the child's current home," would "traumatically change the continuity of the child's life," and "would sever, or at least dramatically change the relationship that she has with her closest sibling." The trial court further ruled that it was unwilling to separate L.H. from her older sister because there was clear and convincing evidence that such a separation, when combined with disrupting L.H.'s other relationships and long-term living environment, would cause her emotional harm. Consequently, the trial court granted primary physical custody of L.H. to the maternal grandmother and visitation to the father, and granted joint legal custody to the grandmother and father. The trial court granted no visitation to the mother.

Subsequently, the Georgia Supreme Court issued its opinion in *Stone v. Stone*, 297 Ga. 451, which reversed a trial court's award of joint legal custody to a parent and grandparent. The trial court in the present case then conducted a status hearing with the parties regarding the effect of *Stone* on the custody decision here. After the status hearing, the trial court entered a written order in which it granted primary

physical custody and legal custody of L.H. to the maternal grandmother, granted

visitation to the father, and declined to grant any formal visitation to the mother.

In its written custody order, the trial court found that awarding custody to the

maternal grandmother rather than the father or mother was appropriate under the legal

standard set forth in *Clark v. Wade*, 273 Ga. 587, 598-599 (IV) (544 SE2d 99) (2001).

Among other things, the trial court found:

> The Court finds the [maternal grandmother's] home is the only
> home [L.H.] has ever known and the only fixed, certain and stable place
> this child has known;

> Further, the Court finds the [grandmother] to be the only
> caregiver[] that this child has ever known and that the last six years
> during which the child has resided with the [grandmother] transpired
> during very important years of key development for this child;

> The Court finds that its ruling today is essentially solidifying the
> situation that has existed in point of fact over many years of this child's
> life and that removing the child from this environment and awarding
> custody to the [father] would completely and dramatically undermine the
> stability of this child's home and this child's life;

> Further, the Court finds compelling the testimony of numerous
> witnesses as to the close relationship between [L.H.] and her sibling
> with whom she has lived her entire life. The Court is not willing to

separate this child from her closest sibling nor is the Court willing to upset everything in this child's life or undermine and sever her security and her relationships by essentially modifying the "happy arrangement" that the parents have been content to allow all of this time.

. . . .

Accordingly, the Court findings by clear and convincing evidence that an award of custody to the [grandmother] is appropriate. The Court further finds by clear and convincing evidence that to make any other award, including awarding custody to the . . . [f]ather would be harmful, emotionally harmful, to the child not simply by separating her from sibling but by upsetting the child's stable living environment, upsetting every other relationship that the child has, taking the child out of the school which she is currently attending and otherwise severing her relationship with whatever friends it is that she might have developed at school or in the neighborhood, all of which would be significantly emotionally harmful to this child. The Court makes this finding based on clear and convincing evidence.

Upon entry of the trial's court's written order, the father filed the present appeal, challenging the award of custody to the maternal grandmother. The mother did not appeal the trial court's order and has filed a brief in the current appeal arguing for affirmance.

We begin by noting the legal framework applicable in this case. Custody disputes between a biological parent and certain third-party relatives, including grandparents, are governed by OCGA § 19-7-1 (b.1).[2] The seminal case in construing OCGA § 19-7-1 (b.1) is our Supreme Court's plurality decision in *Clark v. Wade*, 273 Ga. 587. See *Trotter v. Ayres*, 315 Ga. App. 7, 8 (2) (726 SE2d 424) (2012). As explained in *Clark* and subsequent cases of the Supreme Court and this Court,

> OCGA § 19-7-1 (b.1) establishes a rebuttable presumption that it is in the best interest of the child to award custody to the parent of the child. The following three presumptions are implicit in the statute: (1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the

[2]OCGA § 19-7-1(b.1) provides in relevant part:
[I]n any action involving the custody of a child between the parents or either parent and a third party limited to grandparent, great-grandparent, aunt, uncle, great aunt, great uncle, sibling, or adoptive parent, parental power may be lost by the parent, parents, or any other person if the court hearing the issue of custody, in the exercise of its sound discretion and taking into consideration all the circumstances of the case, determines that an award of custody to such third party is for the best interest of the child or children and will best promote their welfare and happiness. There shall be a rebuttable presumption that it is in the best interest of the child or children for custody to be awarded to the parent or parents of such child or children, but this presumption may be overcome by a showing that an award of custody to such third party is in the best interest of the child or children. The sole issue for determination in any such case shall be what is in the best interest of the child or children.

11

custody of a parent. The presumption can nonetheless be overcome by the third-party relative showing, by clear and convincing evidence, that parental custody would harm the child. Harm in this context has been defined as either physical harm or significant, long-term emotional harm, not merely social or economic disadvantages. Once the presumption has been overcome, the third-party relative must prove that an award of custody to him or her will best promote the child's health, welfare, and happiness. Thus, in applying the legal standard set forth in OCGA § 19-7-1 (b.1), the trial court need not determine that the parent seeking custody is unfit, only that the third-party relative has established by clear and convincing evidence that awarding custody to the parent would cause either physical harm or significant, long-term emotional harm to the child. If the third-party relative meets this burden, then the relative must show that an award of custody to him or her would best promote the child's health, welfare, and happiness.

(Citations and punctuation omitted.) *Trotter*, 315 Ga. App. at 8-9 (2). See *Strickland*, 298 Ga. at 631 (1); *Clark*, 273 Ga. at 598-599 (IV); *Brawner v. Miller*, 334 Ga. App. 214, 215-217 (1) (778 SE2d 839) (2015); *Lively v. Bowen*, 272 Ga. App. 479, 482-483 (1) (612 SE2d 625) (2005).

In reviewing a trial court's findings in a custody dispute under OCGA § 19-7-1 (b.1), we are mindful that "[i]n the appellate review of a bench trial, a trial court's factual findings must not be set aside unless clearly erroneous." *Strickland*, 298 Ga.

12

at 633 (1). "[D]ue deference must be given to the trial court, acknowledging that it has the opportunity to judge the credibility of the witnesses," and the evidence must be construed in the light most favorable to the trial court's decision. Id. at 633-634 (1). As our Supreme Court has emphasized, it is for the trial court, not appellate courts, "to resolve conflicts in the testimony" in determining whether a child will suffer physical harm or significant, long-term emotional harm if returned to the custody of the biological parent. Id. at 634 (1).

1. On appeal, the father contends that the trial court erred in finding that awarding custody to him would cause L.H. to suffer physical harm or significant, long-term emotional harm, as required by *Clark* and its progeny. While there was no evidence that L.H. would suffer physical harm from an award of custody to her father, we conclude that, when construed under the appropriate deferential standard of review, there was clear and convincing evidence that L.H. would suffer significant, long-term emotional harm.

As the Supreme Court of Georgia has held when contemplating the issues of harm and custody, a trial court must go beyond the parent's biological connection or present fitness and consider a variety of factors, including: (1) who are the past and present caretakers of the child; (2) with whom has the child formed psychological bonds; (3) have the competing parties evidenced interest in, and contact with, the child over

13

time; and (4) does the child have unique medical or psychological needs that one party is better able to meet.

(Punctuation and footnote omitted.) *Brawner*, 334 Ga. App. at 217 (2), quoting *Clark*, 273 Ga. at 598-599 (IV).

Here, it is clear from the trial court's oral ruling at the conclusion of the bench trial and its subsequent written order that the court considered the factors set forth above and found that L.H. would suffer significant, long-term emotional harm if custody were granted to her father. As detailed above, multiple witnesses testified to the unusually strong sibling bond between L.H. and her sister and the emotional damage that would be caused if they were separated from the same household, and about the strong emotional bond between the siblings and the maternal grandmother that had developed over the many years during which they had remained in her care. Additionally, there was evidence that the father acquiesced to the grandmother serving as the day-to-day caregiver of L.H. for many years, that he had failed to exercise all of the visitation available to him under the divorce agreement, that he had repeatedly changed jobs and residences, that his current job was only one month old, and that he had engaged in a romantic relationship with a high school student that he considered to be a model relationship for L.H.

14

Given these particular factual circumstances, and in light of the deferential standard of review, the trial court was entitled to find that L.H. would suffer significant, long-term emotional harm if she were uprooted from virtually the only home she had ever known with her maternal grandmother and older sister and instead placed in the custody of her father. See *Strickland*, 298 Ga. at 634-635 (1); *Brawner*, 334 Ga. App. at 218-219 (2); *Lively*, 272 Ga. App. at 483-485 (1). Compare *Bell v. Taylor*, 334 Ga. App. 267, 269 (779 SE2d 42) (2015).[3] While "some level of stress and discomfort may be warranted when the goal is reunification of the child with the parent," *Clark*, 273 Ga. at 598 (IV), the trial court was authorized to find that the emotional harm to L.H. would exceed the "routine" level of stress inherent in any change of custody, particularly in light of the unusually close sibling relationship that would be if disrupted if custody were placed with the father. Consequently, we discern no basis for reversal on the asserted ground.

---

[3] The father relies upon *Bell* in arguing that reversal is required, but that case is clearly distinguishable. In *Bell*, the trial court, before awarding custody of the child to the grandmother rather than the mother, "remarked that he could decide the case either way and would sleep well at night because he felt that both parties would take good care of [the child]." 334 Ga. App. at 269. The trial court in the present case never suggested that he "could decide the case either way" and consistently found that placement of L.H. with the father rather than the maternal grandmother would harm L.H. and not be in her best interest.

15

2. The father also contends that the trial court misconstrued the Supreme Court of Georgia's recent decision in *Stone v. Stone*, 297 Ga. 451, and thus applied the wrong legal standard in awarding custody of L.H. to the maternal grandmother. We disagree.

In *Stone*, 297 Ga. at 455, our Supreme Court held that, on the one hand, "in situations where a parent is suitable to exercise custody over a child, [OCGA § 19-7-1 (b.1)] does not allow . . . parental custody to be limited by a joint custody arrangement with a grandparent[.]" On the other hand, where neither parent is suitable to have custody under the standard set forth in OCGA § 19-7-1 (b.1) as construed in *Clark*, the Supreme Court in *Stone* held that "a grandparent might certainly be . . . qualified to have sole custody of a minor child." Id. at 455.

Here, as previously noted, the trial court determined that under the standard set forth in OCGA § 19-7-1 (b.1) as construed in *Clark*, sole custody of L.H. should be awarded to the maternal grandmother rather than the mother or father. The trial court's determination was consistent with the holding in *Stone* that a grandparent may be qualified to have sole custody of the child when neither parent is considered suitable under OCGA § 19-7-1 (b.1) and the *Clark* decision, and therefore the trial

16

court committed no error in the legal framework it employed. Accordingly, we affirm the trial court's award of custody to the maternal grandmother.

*Judgment affirmed. Boggs and Rickman, JJ., concur.*