**FIFTH DIVISION**
**MCFADDEN, C. J.,**
**MCMILLIAN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 30, 2019**

# In the Court of Appeals of Georgia

A19A1162. FYFFE v. CAIN et al.

McMILLIAN, Presiding Judge.

After ten-year-old H. C.'s father ("Father") was tragically killed in a motorcycle accident, her mother Sidney Fyffe ("Mother") took custody of the child, but fourteen months later, the trial court granted a petition filed by the paternal grandparents, Scott and Sherree Cain ("Grandparents"), for custody of H. C. The mother appeals the trial court's order, and because we find that the evidence, even when viewed under the appropriate standard, does not support the trial court's conclusion that the Mother's continued custody of H. C. would cause significant, long-term emotional harm to the child, we reverse.

H. C., who was 11 years old at the time the trial court issued its custody order, was born to the Mother and Father in 2007. The couple married in 2009 and divorced

in 2012. In the divorce decree, the trial court awarded legal custody of H. C. to both parents and gave physical custody of H. C. to the Father. The Mother was given visitation rights and ordered to pay child support. On July 29, 2017, the Father was killed in a motorcycle accident. Following the father's death, the Mother took H. C. to live with her, and on August 25, 2017, the Grandparents filed a complaint seeking physical and legal custody of H. C. The trial court appointed a guardian ad litem to represent H. C.'s interests in the proceedings. Following a hearing, the trial court awarded legal and physical custody of H. C. to the Grandparents and visitation to the Mother, entering an order prepared by the Grandparents' counsel at the trial court's direction. The Mother filed the instant appeal, asserting in a single enumeration of error, that the trial court erred in awarding custody to the Grandparents because they failed to rebut the presumption under OCGA § 19-7-1 (b.1) in favor of the Mother by clear and convincing evidence.

1. The start of any analysis that affects parental rights is the recognition that a parent has "a constitutional right under the United States and Georgia Constitutions to the care and custody of their children[]" and that this right "is a fiercely guarded right that should be infringed upon only under the most compelling circumstances." (Citation and punctuation omitted.) *Clark v. Wade*, 273 Ga. 587, 596 (IV) (544 SE2d

2

99) (2001) (plurality opinion). See also *In the Interest of K. M.*, 344 Ga. App. 838, 844 (1) (811SE2d 505 (2018). To guard that right, a non-parent seeking custody must overcome three constitutionally based presumptions in favor of parental custody: "(1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the custody of a parent." (Citation and punctuation omitted.) *Jewell v. McGinnis*, 346 Ga. App. 733, 736 (1) (816 SE2d 683) (2018).

In custody disputes between a parent and close third-party relatives such as grandparents, OCGA § 19-7-1 (b.1) provides that the "sole issue for determination . . . shall be what is in the best interest of the child or children." However, in order to protect the parent's constitutional rights and to overcome the constitutionally based presumptions, our courts have held that the non-parent under these circumstances "must show, with clear and convincing evidence,[1] that the child will suffer either physical harm or significant, long-term emotional harm if custody is awarded to the parent." *Strickland v. Strickland*, 298 Ga. 630, 631 (1) (783 SE2d 606) (2016). To

[1] "[U]nder Georgia law, the standard of clear and convincing evidence is an intermediate standard of proof which is greater than the preponderance of the evidence standard ordinarily employed in civil proceedings, but less than the reasonable doubt standard applicable in criminal proceedings." (Citation and punctuation omitted.) *Jewell*, 346 Ga. App. at 736 (1).

assess harm, "trial courts must consider a variety of factors beyond biological connection or generalized notions of parental fitness," including

> (1) who are the past and present caretakers of the child or children; (2) with whom has the child or children formed psychological bonds and how strong are these bonds; (3) have the competing parties evidenced interest in, and contact with, the child or children over time; and (4) are there any unique medical or psychological needs of the child or children.

Id. Moreover, harm in this context does not include "merely social or economic disadvantages." *Brawner v. Miller*, 334 Ga. App. 214, 216 (1) (778 SE2d 839) (2015). Suffice it to say, a non-parent bears a heavy burden in seeking to take custody of a child away from a parent.

Nevertheless, [i]n reviewing a trial court's findings in a custody dispute governed by OCGA § 19-7-1 (b.1), "[i]n the appellate review of a bench trial, a trial court's factual findings must not be set aside unless they are clearly erroneous." *Strickland*, 298 Ga. at 633 (1). Moreover, "due deference must be given to the trial court, acknowledging that it has the opportunity to judge the credibility of the witnesses, and the evidence must be construed in the light most favorable to the trial court's decision." (Citation and punctuation omitted.) *Holdaway v. Holdaway*, 338 Ga. App. 477, 483 (789 SE2d 817) (2016).

4

2. With these standards in mind, we turn to the trial court's findings of fact to assess the court's conclusion that significant, long-term emotional harm[2] would result from allowing the Mother to continue with custody and that it is in the best interests of H. C. for her Grandparents to be awarded permanent physical custody.

(a) *H. C.'s Care While in her Mother's Custody*

The trial court acknowledged that in the fourteen months that H. C. was in her Mother's custody, her grades were "quite good" and remained at the same level as when her Father was alive. However, the trial court found that the Mother had used the "F" word in front of H. C. and on social media and that she had called the Grandparents profane names.[3] Twice, H. C. had been put "on restriction" and had her cell phone taken away from her as discipline. Also, the Mother limited visitation with the Grandparents, and on one occasion it was because H. C. was "on restriction." The Mother also received a speeding ticket while H. C. was in the car.

---

[2] The trial court did not conclude that H. C. would suffer any physical harm by continuing to live with the Mother, but noted in several findings of fact the jobs that the Mother has held over time, that she is now receiving $2000 per month from the Social Security Administration, and that she has had several residences since her divorce.

[3] The trial court made no finding that H. C. actually heard this name-calling, while noting that the Grandmother believed that H. C. heard it over the speakerphone.

Even viewing these findings with deference, they fail to support the conclusion that H. C. would suffer significant, long-term emotional harm if left in her Mother's custody. The guardian ad litem testified that he was not bothered by the Mother's language and opined that the Mother had "done a fine job raising the child," and that the child's "optimistic, bright, smiling, shining personality" "is no doubt in large part due to the fantastic job that her mother has done." The Grandparents offered no evidence showing that a parents' use of profanity can result in emotional harm to a child. Indeed, if merely using profanity can cause a parent to lose custody, the majority of parents might be in danger of losing custody of their children.[4] Similarly, one speeding ticket and the Mother's decision to discipline her pre-teen child by placing her on restriction and taking away her phone cannot be considered harmful absent additional evidence of negative circumstances surrounding the ticket or that the discipline resulted in harm to the child.[5]

---

[4] A 2006 Associated Press Profanity Study, which interviewed 1001 adults, found that 65% used the F-word in conversations, and 79% used swear words in conversations. See *https://www.ipsos.com/sites/default/files/news_and_polls/2006-03/mr060328-2.pdf.*

[5] Although the guardian ad litem testified that limiting visitation with the Grandparents, especially the Grandfather, would harm H. C., our legislature has provided a means by which family members may seek visitation of a child whose parent has died, without taking custody away from the other parent. See OCGA § 19-

(b) *The Mother's Non-Compliance with the Divorce and Custody Decree*

The Father and Mother divorced in 2012, and the trial court found that from 2012 to 2017 when the Father was killed, the Mother was unable to establish that she made any child support payments although she testified that she made a little more than one half of them. The trial court made no finding that the Mother's lack of child support had caused the child any harm, emotional or otherwise, and the evidence is to the contrary.[6] Moreover, the Grandparents presented no evidence that H. C. had been deprived in any way during the 14-month period the Mother had custody.

The court also found that as to the Mother's visitation between 2014 and 2017, family friends testified that the Mother failed to avail herself of approximately half of her court-awarded visitation opportunities and "[o]n at least 10 occasions . . . [the Mother's] arrival for the visitation pickup was excitedly anticipated by [H. C.], but

---

7-3. But see *Patten v. Ardis*, 304 Ga. 140, 145 (3) (816 SE2d 623) (2018) (holding OCGA § 19-7-3 (d), permitting grandparent visitation absent clear and convincing showing of harm to child, is unconstitutional).

[6] The record reflects that the Father never attempted to collect the overdue child support through any court proceeding. Both the Mother and H. C.'s stepmother (the Father's widow) testified that the Father and Mother agreed not to go by the divorce decree, but instead had their own personal agreement regarding child support. Although the stepmother was not aware of the terms of that agreement, she said that H. C. was always taken care of: "Whenever [H. C.] needed something, her mom was there."

[the Mother] did not appear and offered no explanation for her non-appearance. This left the child visibly and audibly upset, and even in tears."

However, the trial court's finding regarding visitation is clearly erroneous as it is not supported by the evidence, and thus, it must be set aside. See *Strickland*, 298 Ga. at 633 (1). Although the family friends, a married couple who lived in an apartment on the Father's property for a time, testified that H. C. would get upset when her Mother missed a visitation, they never said the Mother failed to keep one half of her visits[7] or that the child was upset on ten occasions. While one of the

[7] Contrary to the dissent's assertion, the trial court never found that the Mother missed half of her visitations, but rather that the family friends testified that she did, which is incorrect. In fact, no one with knowledge of the matter ever testified that the Mother missed half of her visitations. The Grandmother only "approximate[d]" that the Mother missed half of her visitations, but she admitted that she never lived with her son or stayed with him for extended periods and that she personally never witnessed any visitation exchanges. Thus, she had no direct knowledge of the issue, and she did not cite any basis for her conjecture. The Mother stated that she did not miss half the visits but only "maybe" one visit every other month, a small fraction of the multiple visits scheduled each month. Therefore, no evidence would have supported the finding the dissent asserts, even if the trial court had made such a finding. In contrast, the stepmother testified that she was present for "all of the times that visitation occurred or did not occur" in the four years immediately prior to the Father's death, that the Mother very rarely had to cancel her visits, and when she did, it was because "life sometimes happens." She also said the Mother would make up for the missed visitations by arranging for a visit another time. Moreover, she said that before the Father died, the Mother came to many of the child's cheerleading events and other activities outside of visitation.

8

friends said it happened "quite often," the other friend said that she did not keep track of how many days the visits were missed because "[i]t was not [her] responsibility." Moreover, no evidence supports the trial court's findings that the missed visitations were without explanation. Although one of the friends testified that she was unaware of the "exact reasons" for the Mother's missed visitations, there is no evidence that the Mother failed to give the Father or H. C. a reason. To the contrary, that friend testified that at the last minute the Mother "would change the plan, something happened; don't know. I don't know the extent of the reasoning[,]" and the other friend said that missed visitations occurred when something came up.

Thus, the trial court's unsubstantiated finding in this regard fails to support a determination that H. C. would suffer significant, long-term emotional harm if left in her Mother's custody. Although before the Father died, the Mother may not have made all her child support payments and may not have exercised all of her visitation rights, she took custody of H. C. after his death and was able to support the child and provide for her emotional needs. Likewise, the fact that H. C. was upset with her Mother on occasion for missing visitation hardly supports significant, long-term emotional harm, especially in the absence of any evidence of upset or disagreement

9

in the relationship between H. C. and the Mother in the fourteen months the child was in the Mother's custody.

(c) *The Mother's Conduct*

The trial court also found that the Mother "had a lifetime history of questionable and sometimes immoral conduct when it comes to sex[,]" pointing to two abortions the Mother had undergone, a child born out of wedlock after her divorce from the Father, a male roommate[8] while still married to the Father, two boyfriends that she lived with, and two other male friendships that the Mother described as nonsexual and platonic. The trial court then explains in its conclusions of law that:

> The Court is concerned about *example* and *exposure*.
>
> The mother in this case has set a very poor moral *example* for her daughter and the relationships she has had with men: repeated abortions, out-of-wedlock childbirth, having one man as a "roommate" while married to another, engaging in serial cohabitation without benefit of vows.

---

[8] The Mother described her relationship with the roommate as "completely platonic."

Although the trial court notes that these relationships were open and not hidden from the child, he makes no finding that any of these relationships, or the relationships collectively, have resulted in harm to the child. "Under Georgia law, a parent's cohabitation with someone is not a basis for denying custody or visitation absent evidence that the child was harmed or exposed to inappropriate conduct." *Jewell*, 346 Ga. App. at 738 (1). See *Arnold v. Arnold*, 275 Ga. 354, 354 (566 SE2d 679) (2002); *Brandenburg v. Brandenburg*, 274 Ga. 183, 184 (1) (551) SE2d 721 (2001). Likewise, the trial court made no finding that H. C. was even aware that her Mother had abortions, much less that she was harmed by them.

The trial court also found that at least two of the men the mother had allowed in her life "with [H. C.'s] knowledge and in her presence," were violent individuals and that the violence had progressed to the extent that the Mother had to obtain a permanent protective order against one and the other one is now facing criminal charges. However, no evidence supports that H. C. had knowledge that these men had been violent or that they had been violent in her presence.[9] Moreover, although these

_____

[9] The trial court's finding about H. C.'s knowledge and presence appears to refer to her exposure and knowledge that the two men were in her Mother's life, not their violent tendencies. Moreover, although the dissent notes that the mother testified she was living with one of these men when she took custody of H. C., she said that the day she got her daughter, she went with friend to get her things and left from there

11

past episodes of violence in the Mother's life are troubling, there is absolutely no evidence that the mother had allowed the men to be violent to H. C. or that the child had any knowledge that her Mother had sought protection from the courts from these men. Accordingly, there is no evidence showing that the child had suffered emotional or other harm as a result of the actions of these men.

The trial court also found that the Mother had engaged in acts of violence, the latest of which took place in 2017, involved a dispute with the mother of a former boyfriend, who was knocked to the ground during the altercation.[10] Although this finding is likewise troubling, the trial court made no finding, and we have not found any evidence in the record, that H. C. was exposed to any of these incidents, subjected to any violence, or was even aware of her Mother's actions in this regard. Nor was there any finding or evidence that in the fourteen months that H. C. was in her Mother's custody, that the Mother had engaged in any violence or been involved in any violent or potentially violent relationships.

---

immediately. She found another place for the two of them to live.

[10] In addition to the 2017 incident, one incident happened eleven years before the hearing when the Mother was a teenager, before H. C. was born, and another happened when the Mother hit the Father in the face in 2008, ten years before the hearing. However, there is no evidence that any arrests occurred or that any protective orders were sought or issued in connection with these incidents.

(d) *Findings Regarding the Grandparents*

The trial court found that the Grandparents "have been a major part of [H. C.'s] life from the very beginning," noting that as a baby H. C. and her Mother moved in with the Grandparents while the Father lived out of state. The trial court did not find that H. C. otherwise lived with her Grandparents although they maintained a bedroom in their home for her, served as her babysitters, celebrated holidays with her, and took her on outings.[11] The trial court also made findings on the Grandparents' stable employment history and home life, noting that they "have been always faithful to one another," and that there has been "no violence between themselves or with any third party, no cussing, and no smoking." The Grandparents have been active members of a church for 30 years.

However, such factors are not relevant to a consideration of whether the child is likely to suffer long-term emotional harm in the Mother's custody. In determining the issue of long term harm under Georgia law,

> a court is not permitted to terminate a parent's natural right to custody merely because it believes that the children might have better financial,

---

[11] We note that the Grandmother testified that the Father and H. C. moved back in with the Grandparents for some months in the year after the divorce, but the trial court made no finding in this regard.

educational, or moral advantages elsewhere, that is, the parent's ability to raise her children is not to be compared to the fitness of a third person.

(Citation and punctuation omitted.) *Jewell*, 346 Ga. App. at 736 (1). Comparing the Grandparents' lifestyle to the Mother's on the basis of such moral and economic distinctions "is precisely the sort of comparison trap that trial courts are not permitted to fall into." Id at 737 (1). See also *Floyd v. Gibson*, 337 Ga. App. 474, 476-77 (1), (788 SE2d 84) (2016).

3. Based on these factual findings, we find that the trial court lacked clear and convincing evidence to support the conclusion that H. C. would suffer significant, long-term emotional harm if left in her Mother's custody. Although the trial court purported to apply the four factors as set out in *Strickland*, the court's conclusions are unsupported by the factual findings.

First, the court concluded that the Grandparents "have been the child's more faithful and constant caretakers through the 11 years of her life," yet it was the Father and/or the Mother who had custody of H. C. for her entire life up until the custody hearing, and the trial court found only that H. C. lived with the Grandparents for nine months during the first year of H. C.'s life (along with her Mother) and engaged in

14

outings and holidays, with no consideration of the *fourteen* months H. C. had lived with her Mother immediately prior to the hearing despite the requirement that the court consider a child's past and present caretakers. *Strickland*, 298 Ga. at 631 (1).

Second, the court concluded that H. C.'s "psychological bonds [with the Grandparents] have never suffered the inattention and discontinuity that has characterized her relationship with her mother " but as noted above, the court's factual findings regarding the Mother's involvement with the child are without evidentiary support, and the trial court made no findings, and apparently failed to even consider the extent of the bond between H. C. and her Mother despite the substantial evidence presented in that regard[12] and the requirement that a court consider "with whom has the child . . . formed psychological bonds and how strong are these bonds." *Strickland*, 298 Ga. at 631 (1).

---

[12] In addition to the guardian ad litem's testimony, the school social worker who worked with H. C. on a regular basis for the year before the custody hearing testified that H. C. was thriving and that she had no concerns about the child's emotional well-being. H. C.'s stepmother and others testified that in the year or so that the Mother had custody of the child, she had become more open emotionally, had turned into a very positive and happy child, and she and her Mother shared a very close mother-daughter relationship and that the child shared a strong sibling bond with her Mother's younger daughter. We note that the trial court made no findings discounting the credibility of any of these witnesses.

15

Third, the court found that the Mother has not "manifested a steady 'interest' in the child . . . nor 'contact' with the child," citing past failure to pay child support and exercise her visitation rights. However, the court's findings with regard to visitation are unsupported by the record, and the trial court failed to make any findings as to any involvement by the Mother in the child's life, even though the evidence is undisputed that H. C. lived with the Mother for the fourteen months prior to the custody hearing, during which time the Mother showed an active interest in the child's schooling and extracurricular activities and ensured that the child received grief counseling both at school and elsewhere after the death of her Father.

Because the trial court abused its discretion by failing to properly apply the four *Strickland* factors, and the evidence at the custody hearing falls far short of supporting a finding by clear and convincing evidence that awarding custody to the Mother would cause significant, long-term emotional harm to H. C., we reverse the trial court's order and remand the case with direction for the trial court to enter a custody award in favor of the Mother.[13]

---

[13] Because the Grandparents failed to overcome the presumption in favor of the Mother's custody, we do not reach the issue of whether they established "that an award of custody to [them] will best promote the child's health, welfare, and happiness." *Clark*, 273 Ga. at 598 (IV).

*Judgment reversed. McFadden, C. J., concurs. Senior Appellate Judge Herbert E. Phipps dissents.\**

***\*THIS OPINION IS PHYSICAL PRECEDENT ONLY. SEE COURT OF APPEALS RULE 33.2 (a).***

A19A1162. FYFFE v. CAIN et al.

PHIPPS, Senior Appellate Judge, dissenting.

As the majority points out, the trial court's order contains findings of fact about the mother's lifestyle which are legally irrelevant. The order, however, also contains additional, relevant findings explicitly addressing the factors our Supreme Court has directed trial courts to consider in *Clark v. Wade*, 273 Ga. 587 (544 SE2d 99) (2001). Because the trial court's other findings of fact were supported by clear and convincing evidence, and because our law requires that in reviewing a bench trial, "a trial court's factual findings must not be set aside unless they are clearly erroneous[,]"

*Strickland v. Strickland*, 298 Ga. 603, 633 (1) (783 SE2d 606) (2016), I respectfully dissent.

In *Clark*, the Supreme Court found that the factors trial courts consider "should include" the child's past and present caretakers, whether the competing parties have shown interest in and contact with the child over time, and the child's psychological bonds with those parties. Id. at 598 (IV). In assessing significant emotional harm, a trial court should "go beyond the parent's biological connection or present fitness to encompass the child's own needs." Id.

The trial court found that the Mother had missed about half of her court-awarded visitations. While one roommate testified that the Mother failed to show up for visitation "quite often," the Grandmother testified that she believed the Mother missed about half of her visitation opportunities. The Mother denied this, testifying that she missed visitation about every other month. A roommate, who lived with the father and H. C. from 2015 until the father's death in 2017, testified that H. C. was "devastated that her mother wouldn't come get her." By contrast, the trial court heard evidence that in the five years between the divorce and the father's death, H. C. spent "hundreds" of nights with the grandparents, and lived with them for about two weeks after the father died. The Mother testified that she did not take H. C. immediately

2

because she was living with an alcoholic, violent boyfriend not fit to be around children. She also testified that she failed to make about half of her court-ordered child support payments, despite being employed, because she was "recovering from a domestic violence relationship," and acknowledged that she was unable to present proof of *any payment*. The majority, in Division (2) (b), n. 6, focuses on testimony that the father never sued for support as the parents had their own "personal agreement." The Mother testified that they were "very comfortable" with this agreement. Child support, however, exists to provide for the *child's support*, not the *parents' comfort*. The Mother was required, by court order, to pay approximately $25,000 in support. She admittedly violated that order by failing to make all of those payments. In a finding supported by witness testimony and cancelled checks, the trial court determined that the grandparents loaned or gave the father approximately $22,000 "to assist him in the *absence of child support*." (Emphasis supplied.)

The trial court analyzed these facts when making its conclusions under the factors outlined in *Clark*, 273 Ga. at 598 (IV) and n. 60, and our case law supports its conclusions. See *Brawner v. Miller*, 334 Ga. App. 214, 218 (2) (778 SE2d 839) (2015) (upholding award of custody to grandfather where father had, among other things, only occasionally paid child support and child had spent significant time with

3

grandfather, who provided the "vast majority of assistance" to the child); *Holdaway v. Holdaway*, 338 Ga. App. 477, 484 (1) (789 SE2d 817) (2016) (upholding award of custody to grandmother where, among other things, father failed to exercise all visitation and repeatedly changed jobs and residences). As the trial court concluded, the Mother had not manifested a steady interest or contact with H. C. as shown by her admitted failure to pay full support and exercise all visitation.

As discussed in the majority, the Mother also had a series of relationships with violent men. Evidence supported the trial court's findings of fact and legal conclusions that the Mother had her own history of violent, belligerent behavior. The Mother testified that six months before H. C. came to live with her, she put her then-boyfriend's mother in a headlock. The Mother admitted that she acted in response to a "childlike push" from the older woman, whom she testified was "not well." The boyfriend's mother testified that the headlock was so forceful that she fell, injured her arm, and defecated. The Mother also testified, as the trial court found, that she had called the Grandmother a "c-nt" and as recently as a week before trial had called her a "f-cking bitch." *Mauldin v. Mauldin*, 322 Ga. App. 507, 513-514 (3) (b) and 517-518 (4) (745 SE2d 754) (2013) (upholding award of custody to grandparents although child had a strong bond to mother where, among other things, mother's behavior

4

promoted conflict with other family members and grandparents had shown "both the will and ability" to meet the child's needs).

As the majority points out, H. C.'s guardian ad litem indeed said positive things about the Mother's recent interactions with H. C. The trial court found, however, that the guardian ad litem also expressed concern about the Mother's instability, "recent" violent relationships, and the lack of a strong male figure in H. C.'s life. He testified that a strong male relationship is a strong predictor of a child's later self-esteem and that "harm would likely come to this child if she was left in the sole custody of the mother without the influence of [the Grandparents], particularly [the Grandfather]." While noting that the Mother had progressed in the past year, the guardian ad litem testified that an "enormous risk of a grant of sole custody to [the Mother]" remained, whereas there was "almost certainty" that the grandparents would be able to raise H. C. in a stable, healthy home. He recommended that the grandparents have custody to protect H. C. from the Mother's "bad decisions," but that H. C. live primarily with the Mother. See generally *Mauldin*, 322 Ga. App. at 517-518 (4) (finding that the trial court was not required to accept therapists' recommendation against removing child from mother's custody).

5

Finally, as the majority discusses in Division 3, the trial court concluded that H. C.'s "psychological bonds [with the Grandparents] have never suffered the inattention and discontinuity that has characterized her relationship with her mother." This finding is supported by clear and convincing evidence, including testimony from the Mother that the Grandparents are a big part of H. C.'s life, that they love one another, and are closely bonded. The majority notes that the trial court "made no findings, and apparently failed to even consider the extent of the bond between H. C. and the Mother[.]" Yet despite this, the majority would reverse the trial court's order and place custody with the Mother.

This appeal, as with many appeals before us, was replete with conflicting evidence and issues of witness credibility, which are clearly within the province of the trial court. *Holdaway*, 338 Ga. App. at 483. As an appellate court, we need not agree with all of the trial court's reasoning. Rather, we must decide whether clear and convincing evidence supported the judgment. It did. We also must determine whether the trial court's findings were clearly erroneous. They were not. See *Strickland*, 298 Ga. at 631, 633 (1). For these reasons, I respectfully dissent.