**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**November 1, 2021**

# In the Court of Appeals of Georgia

A21A0679. RICHELLO v. WILKINSON et al.

DOYLE, Presiding Judge.

This case comes to us from the Superior Court of White County ("the superior court") after it awarded permanent legal and physical custody of J. R., D. R., and A. R. to Denise and Nelson Wilkinson – the children's maternal grandparents – following the death of their mother during Connecticut divorce proceedings from Joseph Richello, the children's father. The father appeals, arguing that: an emergency ex parte order awarding temporary custody to the grandparents was void because it was signed by the judge before the petition seeking such relief was filed in the Clerk's office; the superior court lacked subject matter jurisdiction over what was in essence a dependency action; the grandparents never served the father; the superior court erred by denying the father's Motion to Vacate and Set Aside the Ex Parte

Order ("the motion to vacate"); the superior court did not have jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA")[1]; the superior court erred by imposing sanctions for the father's failure to appear for his deposition; and there was insufficient evidence to support the final order. For the following reasons, we reverse and remand with direction.

> When reviewing an order in a child custody case, we view the evidence in the light most favorable to the trial court's decision. We will not set aside the trial court's factual findings if there is any evidence to support them, and we defer to the trial court's credibility determinations. We review de novo, however, the legal conclusions the trial court draws from the facts.[2]

So viewed, the record shows that during their marriage, the mother and father resided in Connecticut with the three children, all of whom were born in that State. On July 12, 2017, the father commenced a custody action in Connecticut seeking sole legal and physical custody of the children. The mother then filed for divorce on August 1, 2017, and after the two matters were consolidated, the Connecticut court

---

[1] OCGA § 19-9-40 et seq.

[2] (Citations omitted.) *Mashburn v. Mashburn*, 353 Ga. App. 31, 32 (836 SE2d 131) (2019), citing *Strickland v. Strickland*, 298 Ga. 630, 633 (1) (783 SE2d 606) (2016), *Saravia v. Mendoza*, 303 Ga. App. 758, 758 (695 SE2d 47) (2010).

entered an order on September 7, 2017, approving a pendent lite agreement between the mother and father. Therein, the parties agreed that the parents would have joint legal custody of the children, but the mother would have sole physical custody, and she and the children would relocate to Georgia to live. The agreement also contemplated that the father would have reasonable visitation rights. The mother and children moved to Georgia, and after conciliation efforts failed, in November 2017 and April 2018, the father sought emergency relief in Connecticut to modify custody. In April 2018, the Connecticut court held a hearing,[3] in which it dismissed the father's custody application and denied the father's motion to modify temporary custody ; on November 26, 2018, the Connecticut court entered an order excluding the mother's expert witness in the divorce action and finding that it "has jurisdiction under UCCJEA over the minor children who are residing in Georgia."

The mother and father's Connecticut divorce trial commenced on May 13, 2019, and was scheduled to continue on August 9 and 12, 2019. On July 27, 2019, however, the mother died of natural causes in Georgia. The very next day, the mother's Connecticut attorney filed a suggestion of death in the divorce action,

---

[3] According to the Connecticut court's September 3, 2020 Memorandum of Decision, the evidentiary hearing in the Connecticut court took place over the course of eight days.

prompting the father to file in Connecticut an "Application for Emergency Ex Parte Order of Custody" on July 29, 2019. The father then flew to Georgia to retrieve his children.

While the father was waiting at the White County Sheriff's office for the grandparents to bring the children to him, the grandparents (or their counsel or both) were at the superior court obtaining an ex parte emergency temporary custody order, having alleged that the father was abusive; the mother was found dead in the parent's driveway under "mysterious circumstances"; the "abusive" father was the beneficiary of a $1 million life insurance policy on the mother; the father had failed to exercise his right to visit the children in the two years they had resided in Georgia; the father was the subject of a family violence order of protection issued by the Connecticut court as a result of abusing his late wife; the father was in Georgia seeking to take the children with him to Connecticut; and the father had abused the mother in front of the children.[4] Before the grandparents had filed their petition seeking ex parte emergency

_____

[4] The record belies most of these accusations. The mother died of natural causes, and in response to a claim by the mother of domestic abuse, the Connecticut court found that the father was controlling in the relationship, and the mother perceived the manner in which he spoke to her as verbally abusive, but there was not a pattern of physical abuse by the father against the mother. The Connecticut Court noted an incident in which father forced the mother outside of the house, took her phone and locked the door, and another in which he had possession of a gun,

4

custody, the superior court granted the grandparents temporary custody of the children and enjoined the father from "coming about" the grandparents or the children.[5] That same day – July 31, 2019 – at 2:41 p.m., the grandparents simultaneously filed the ex parte emergency petition for temporary custody ("the ex parte petition"), the signed ex parte order, and an amendment to the ex parte petition changing the style of the case from "In the Interest of J. R., D. R., and A. R." to

threatened suicide, and made comments from which the mother inferred there was a threat to her life; while this conduct was emotionally abusive, there was no pattern of physical abuse. The Connecticut court further noted that the guardian ad litem thought the children would thrive either in Connecticut or Georgia, and the alleged domestic abuse happened outside of the children's presence. These facts were confirmed by the father's Connecticut attorney, who further averred that the father was not continuing under an order of protection; rather the charges against the father were dismissed, as was the order of protection, and the "records have been destroyed pursuant to the Connecticut's Erasure statute."

[5] In addition to granting temporary custody to the grandparents, the ex parte order set a hearing for September 10, 2019. Although neither the ex parte motion nor the ex parte order specified the statutory basis therefor, based on the grandparents' characterization of the father as "abusive," their mention of the mother's "mysterious" death, and the Connecticut family violence order of protection, the order appears to have been entered pursuant to OCGA § 19-13-3, which grants trial courts the authority to enter ex parte temporary family violence protective orders. OCGA § 19-9-3 (c) requires that trial courts must hold a hearing "[w]ithin ten days of the filing of the petition under this article or as soon as practical thereafter, but not later than 30 days after the filing of the petition" and that "[i]f a hearing is not held within 30 days of the filing of the petition, the petition shall stand dismissed unless the parties otherwise agree." Presumably, the scheduling of the September 10, 2019 hearing was an effort to comply with OCGA § 19-9-3 (c).

5

"Nelson and Denise Wilkinson v. Joseph Richello," purporting to add the father as a party respondent. The grandparents did not seek leave of court to amend the petition, nor did they ever serve the father with either the ex parte petition or the July 31, 2019 amendment.[6]

Despite not having been served, on August 5, 2019, the father filed his motion to vacate on the basis that the superior court lacked jurisdiction under the UCCJEA and that there was a pending divorce case in the Connecticut court, which retained jurisdiction.[7] The father attached to his motion to vacate an affidavit of his Connecticut attorney Claire DeVidas, who averred that the trial in the parties' divorce action in Connecticut had already begun and was scheduled to recommence on August 9, 2019. According to DeVidas, immediately following the mother's death, the father had filed in the Connecticut action an application for emergency ex parte order of custody, and the matter was scheduled to be heard on August 1, 2019.

The grandparents filed a response to the motion to vacate, alleging that the father intentionally omitted the fact that on August 1, 2019, the Connecticut court

---

[6] The father learned of the White County proceedings from the Sheriff's office who notified him of the Court's ex parte order.

[7] The father did not raise lack of service or personal jurisdiction in the motion to vacate.

"rejected, denied[,] and dismissed" the father's July 29, 2019 application for an emergency ex parte order, and "[u]pon information and belief, . . . the Connecticut [c]ourt" also "specifically informed and expressly stated to the [father] that [it] would exercise no jurisdiction over the issue of custody of the children and that all litigation involving custody of the children would have to take place in the State of Georgia."[8]

On August 14, 2019, the grandparents filed their second amendment to the ex parte petition, adding a claim for grandparent custody and alleging that the mother's death "may have been the result of a homicide and the father is the only person with known motives for the death." On August 23, 2019, the superior court denied the father's motion to vacate and reserved all issues of custody and jurisdiction until both parties presented their cases at the September 10, 2019 hearing. There is no evidence in the record that the September 10, 2019 hearing ever took place or was continued. Instead, on September 5, 2019, the grandparents filed their third amendment to the ex parte petition, clarifying that the father visited with the children in Connecticut in

---

[8] The appellate record contains a copy of the Connecticut court's August 1, 2019 order denying the father's application for an ex parte order, as well as a "final judgment disposition worksheet" dismissing the case "for lack of jurisdiction [because the mother] is now deceased." Nothing in the record indicates that the Connecticut court addressed jurisdiction over the custody of the children or informed the father of such at that time.

September 2017 at the grandparents' home for two hours the same month, and in Connecticut on December 12, 2017. On September 13 and October 2, 2019, the father filed his responses to the second and third amendments to the ex parte petition, respectively. Then, on October 15, 2019, the parties filed a joint motion for continuance from an October 15 calendar on the basis that discovery was ongoing and that the case was not ready to proceed. There is no agreement to extend the ex parte order in the record.

By notice dated September 30, 2019, the grandparents scheduled the father's deposition to take place at his attorney's offices on November 22, 2019. Prior to the date of the deposition, the father's then-counsel filed a motion to withdraw, which was not granted until November 27, 2019. The day before the father's scheduled deposition, his new attorney contacted the grandparents' counsel and informed him via voice mail that the father would not be attending the deposition the following day. Nevertheless, the grandparents' counsel and the father's original attorney appeared at the deposition location; the father did not appear. No further efforts to reschedule the deposition appear in the record. Instead, on December 13, 2019, the grandparents moved for the imposition of sanctions based on the father's failure to appear at the deposition, seeking an order that "the facts claimed by the [grandparents] shall be

8

taken to be established" and that the father would be prohibited from opposing their claims or introducing evidence regarding custody.[9]

Following a hearing, the superior court entered an order on February 18, 2020, granting the grandparents' motion and entering sanctions against the father for his "wil[]ful and wanton refusal and failure to attend his deposition" and ordering that

> the facts claimed by the [grandparents] shall be taken to be established for purposes of this action[,] and the [father] is hereby prohibited from opposing the [grandparents'] claims for immediate, temporary[,] and permanent legal and physical custody of the minor children . . . , and the [father] is hereby prohibited from introducing matters in evidence in opposition to the [grandparents'] claims for . . . custody . . .[,] and the [father] is further hereby prohibited from introducing any evidence or matters in evidence supporting any of his claims in this case.

The superior court also "expressly reject[ed] the [father's] argument that the [c]ourt lacks jurisdiction in this case or that the [father] has a valid defense of lack or insufficiency of service of process." The father applied for a certificate of immediate

---

[9] On January 6, 2020, the grandparents also filed a motion to compel discovery and for sanctions based on the father's failure to respond to interrogatories or to produce documents. The appellate record does not contain a specific ruling on the motion to compel, and it was not addressed in the February 2020 sanctions order.

review, which the grandparents opposed, and the superior court denied the application.

Thereafter, the father filed a pleading in the Connecticut court to obtain custody of the children.[10] On September 4, 2020, the Connecticut court entered a memorandum of decision finding that Georgia, not Connecticut, had exclusive jurisdiction over the issue of custody of the children under the UCCJEA.[11]

The superior court held a final hearing on October 20, 2020, at which the father's attorney was present, but he did not appear.[12] The children's maternal aunt

_____

[10] The final order in the instant case stated that the father had represented to the Connecticut court that no other state besides Connecticut had an interest in the custody issue, and he did not disclose that the Georgia court had already expressly ruled that jurisdiction was proper in Georgia. However, a review of the Connecticut custody petition shows that while the father did check the box indicating that no other state had an interest in hearing the case, he also disclosed that the grandparents were "trying to get an order in Georgia."

[11] The Connecticut order stated: "The three children have not resided in Connecticut for nearly three years. Their care, protection, training, and personal relationships . . . [are] in Georgia where they have resided since September 2017."

[12] Despite the court's previous ruling regarding personal jurisdiction and service, the father's counsel continued to object to the proceedings based on lack of service and jurisdiction over the subject matter. The father's counsel also indicated that the father did not appear because he was not allowed to present any evidence or otherwise defend against the grandparents' allegations pursuant to the court's sanctions order.

and both grandparents were the only witnesses. Pursuant to the superior court's sanction order, the father was not allowed to present evidence or defend against the grandparents' allegations. On November 2, 2020, the superior court entered a final order awarding the grandparents permanent legal and physical custody of the children. The court also prohibited the father from having any contact or visitation with the children, and although the grandparents did not request support, the court ordered the father to pay $5,000 per month in child support and to set up a college savings account in the amount of $20,000 per child.[13] This appeal followed.

1. *Emergency ex parte order*. The father contends that the ex parte order was void because it was issued in a case that did not exist at the time the order was signed. This enumeration is moot because the ex parte order addressed temporary custody, and a permanent final order has now been entered.[14] Further, the ex parte order would

---

[13] The superior court noted that the father earned more than $225,000 per year and had received a $1 million cash benefit from a policy insuring the mother's life.

[14] See *Edwards v. Edwards*, 226 Ga. 875, 878 (2) (178 SE2d 168) (1970) ("The enumeration complaining of a change in custody . . . need not be considered [because t]his issue involved a period of temporary custody, prior to the final decree, and is now moot."); *Roberts v. Kinsey*, 308 Ga. App. 675, 678 (4) (708 SE2d 600) (2011) ("'Th[e] final order renders any issues regarding the validity of the temporary order moot.'").

have lapsed as a matter of law because the superior court did not extend it.[15] Thus, any error in signing the ex parte order prior to the filing of the ex parte petition provides no basis for reversal.

2. *Jurisdiction.* Next, the father argues that the superior court lacked jurisdiction over the ex parte petition because it was in essence a dependency action that should have been filed in juvenile court. We disagree.

"We review the question of whether a court lacks subject-matter jurisdiction, an issue of law, for plain legal error."[16] The father is correct that "'[t]he juvenile court has exclusive original jurisdiction over juvenile matters of dependency and is the sole court for initiating actions concerning a child that is alleged to be a dependent

---

[15] See OCGA § 19-13-3 (c). The grandparents' attorney claimed that the father's initial attorney consented to extend the ex parte order, but the record includes only a joint motion for continuance from an October 15, 2019 calendar because "both parties are in the process of preparing discovery requests. As discovery is still pending, this matter is not ready to proceed in court."

[16] *Kasper v. Martin*, 354 Ga. App. 831 (841 SE2d 488) (2020).

12

child.'"[17] But "[o]nly superior courts . . . have original jurisdiction to hear custody matters."[18]

Here, the grandparents' ex parte petition alleged that the father was abusive and had been absent from the children's lives and that the children were in need of protection and dependent, but it sought custody of the children, not a finding of dependency. And none of the amendments to the ex parte petition sought a finding that the children were dependent. Finally, the final order granted the grandparents permanent legal and physical custody; it did not make a dependency determination. Therefore, the superior court had jurisdiction over this custody matter, and the father's argument that it was a dependency action proper only in juvenile court is without merit.

3. *Service.* The father also contends that he was never served. Because the father did not raise this defense in his earliest pleading, this argument provides no basis for reversal.

---

[17] (Punctuation omitted.) Id. at 833.

[18] Id., citing Ga. Const. of 1983, Art. VI, Sec. IV, Par. I (Georgia Constitution bestows on superior courts "jurisdiction in all cases, except as otherwise provided in this Constitution"); *Ertter v. Dunbar*, 292 Ga. 103, 105 (734 SE2d 403) (2012); *In the Interest of C. A. J.*, 331 Ga. App. 788, 792 (2) (771 SE2d 457) (2015) ("Issues of permanent child custody . . . fall within the superior court's jurisdiction.").

13

"[U]nder OCGA § 9-11-12 (h) (1) (B), a defense of lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of service of process is waived if it is neither made by motion under OCGA § 9-11-12 nor included in a responsive pleading, as originally filed."[19]

Here, the father filed his motion to vacate on August 5, 2019; he did not raise lack of service in the motion to vacate, nor did he raise it in either of his responses to the second and third amended petitions. In fact, he did not raise the issue of insufficient service until the January 2020 hearing on the grandparents' motion for sanctions. Accordingly, the father has waived this issue.

4. *Jurisdiction under the UCCJEA*. The father also contends that the trial court lacked jurisdiction under the UCCJEA. We disagree.

"We review for abuse of discretion a trial court's [jurisdictional] determination . . . under the UCCJEA."[20] OCGA § 19-9-63, which is a part of the UCCJEA, provides in relevant part that a Georgia court

---

[19] (Punctuation omitted.) *Burch v. Dines*, 267 Ga. App. 459, 461 (2) (600 SE2d 374) (2004).

[20] *Alden v. Yarborough*, ___ Ga. App. ___ (862 SE2d 148) (2021). See *Odion v. Odion*, 325 Ga. App. 733, 736 (1) (e) (754 SE2d 778) (2014).

14

may not modify a child custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under paragraph (1) or (2) of subsection (a) of Code Section 19-9-61 and: (1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under Code Section 19-9-62 or that a court of this state would be a more convenient forum under Code Section 19-9-67; or (2) A court of this state or a court of the other state determines that neither the child nor the child's parents or any person acting as a parent presently resides in the other state.

OCGA § 19-9-61 (a) provides:

Except as otherwise provided in Code Section 19-9-64, a court of this state has jurisdiction to make an initial child custody determination only if: (1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state; (2) A court of another state does not have jurisdiction under paragraph (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under Code Section 19-9-67 or 19-9-68 and: (A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and (B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships; (3) All courts having jurisdiction under paragraph (1) or (2) of this subsection

15

have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under Code Section 19-9-67 or 19-9-68; or (4) No court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3) of this subsection.

Here, with the agreement of the father, the children began living in Georgia in September 2017 with their mother and the grandparents, who cared for them until the mother's death in July 2019. The children had relationships with their grandparents and extended family members in Georgia. While the Connecticut court originally determined in 2018 that it had jurisdiction over the children under the UCCJEA, that ruling, along with the father's July 27, 2019 Application for Emergency Ex Parte Order of Custody became moot when the Connecticut court dismissed the divorce action after the mother's death. And in response to the father's renewed custody petition in Connecticut in 2020, the Connecticut court issued an order finding that Georgia, not Connecticut, had exclusive jurisdiction over the issue of custody of the children under the UCCJEA.

Given the Connecticut court's determination that it no longer had exclusive continuing jurisdiction over custody matters regarding the children and that the children had resided in Georgia with their mother and grandparents for more than two

16

years, the superior court did not abuse its discretion by exercising jurisdiction under the UCCJEA.[21]

5. *Motion to vacate*. Next, the father argues that the trial court erred by denying his motion to vacate on the grounds that the order was void, the superior court lacked subject matter jurisdiction, and the grandparents failed to perfect service on him. Based on our holdings in Divisions 1, 2, and 3, this enumeration provides no basis for reversal.[22]

6. *Sufficiency of the Evidence*. As an initial matter, the father contends that the superior court erred by prohibiting him from opposing the grandparents' custody claims and from introducing evidence in opposition to them or in support of his own as a sanction for his failure to appear for his deposition. We agree that the trial court

---

[21] See OCGA § 19-9-63; *Cohen v. Cohen*, 300 Ga. App. 7, 8-10 (2) (684 SE2d 94) (2009) (holding that Georgia superior court had jurisdiction under OCGA § 19-9-61 (a) (3) because the West Virginia court in which the mother previously had filed a divorce and custody petition had issued a ruling holding that the mother was a resident of Georgia and refusing to exercise jurisdiction).

[22] Further, to the extent the father argues that the order should have been vacated because the superior court failed to include the requisite findings of fact, the ex parte order was never extended by the superior court and would have lapsed by operation of law. See OCGA § 19-9-3 (c). Thus, any such argument is moot.

17

abused its discretion,[23] but because the grandparents failed to meet their burden of

[23] "In general, trial judges have broad discretion in controlling discovery, including imposition of sanctions, and appellate courts will not reverse a trial court's decision on such matters unless there has been a clear abuse of discretion." *Day v. Mason*, 357 Ga. App. 836, 842 (4) (851 SE2d 825) (2020) (punctuation omitted). And pursuant to OCGA § 9-11-37 (d) (1), if a party fails to appear for his properly noticed deposition, a trial court may issue an order that, among other things, (1) provides that the designated facts in support of the aggrieved party's claims shall be taken to be established; (2) prohibits the disobedient party from supporting or opposing designated claims or defenses or him from introducing certain evidence; and/or (3) strikes pleadings or dismisses the action or renders a default judgment against the disobedient party. But "the trial court should attempt to compel compliance with its orders through the imposition of lesser sanctions than dismissal. The drastic sanctions of dismissal and default cannot be invoked under OCGA § 9-11-37 except in the most flagrant cases – where the failure is wilful, in bad faith[,] or in conscious disregard of an order."*Joel v. Duet Holdings*, 181 Ga. App. 705, 707 (353 SE2d 548) (1987) (citation and punctuation omitted).

Here, the sanction was imposed for the father's single act of failing to appear for his deposition after notifying opposing counsel that he would not attend and during a time when his attorney had filed a motion to withdraw and while his arguments regarding jurisdiction remained pending before the court. There was no finding by the superior court that the father had engaged in a pattern of discovery abuse or failed to comply with notices or orders of the court. Pretermitting whether the father's failure to appear was excusable, this sanction – in lieu of imposing a lesser sanction – is unduly harsh. Compare *Woods v. Gatch*, 272 Ga. App. 642, 643-644 (613 SE2d 187) (2005) (affirming dismissal of the complaint pursuant to OCGA § 9-11-37 (b) (2) because the plaintiff failed to attend three properly noticed depositions, even after being ordered to do so by the trial court for one of them, and the plaintiff failed to respond to the motion for sanctions); *Smith v. Adamson*, 226 Ga. App. 698, 701 (2) (487 SE2d 386) (1997) (affirming the dismissal of a case without prejudice because the plaintiff "twice failed to attend her scheduled deposition – at least one of which was clearly court-ordered" and the court found that "her failure to cooperate was intended to defeat the discovery process and delay trial of the case.").

18

proof at the final hearing, it is unnecessary to remand the case for further proceedings, and we reverse with instructions to the trial court to enter an order awarding custody to the father.[24]

We begin our analysis by reiterating that "under both the United States and Georgia Constitutions, parents have a fundamental right to the care and custody of their children."[25] And "[t]his . . . is a fiercely guarded right that should be infringed upon only under the most compelling circumstances."[26]

OCGA § 19-7-1 (b.1), which governs custody disputes between a natural parent and close third-party relatives, including grandparents, provides in relevant part:

---

Given that the custody of and contact with his children were at stake and that the sanction resulted in what was essentially a termination of his parental rights, we conclude that under these circumstances, the draconian discovery sanction constituted a clear abuse of discretion.

[24] Any potential outstanding issues regarding visitation by the grandparents should also be resolved upon remand.

[25] *Mashburn*, 353 Ga. App. at 41 (1).

[26] (Punctuation omitted.) Id., quoting *Clark*, 273 Ga. at 596-597 (IV) and citing *Troxel v. Granville*, 530 U. S. 57, 65 (2) (120 SCt 2054, 147 LE2d 49) (2000) (plurality opinion) (the constitutional right of parents to "the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by this Court") (punctuation omitted).

19

[I]n any action involving the custody of . . . child[ren] between . . . [a] parent and a . . . grandparent[,] . . . parental power may be lost by the parent . . . if the court hearing the issue of custody, in the exercise of its sound discretion and taking into consideration all the circumstances of the case, determines that an award of custody to such third party is for the best interest of the children . . . and will best promote their welfare and happiness. *There shall be a rebuttable presumption that it is in the best interest of the . . . children for custody to be awarded to the parent . . . of such . . . children, but this presumption may be overcome by a showing that an award of custody to such third party is in the best interest of the child or children.*[27]

Under the statute, therefore, it is the third part[ies] seeking custody of the child[ren] who bear[] the burden of coming forward with evidence showing that it is in the child[ren's] best interests that the child[ren be removed from parental custody. And until the petitioner[s] come forward with such evidence, a parent is under no burden to show that [he] is a fit parent or that [his] child[ren] will be safe in [his] custody.[28]

---

[27] (Emphasis supplied.)

[28] *Mashburn*, 353 Ga. App. at 42 (1), citing *Troxel*, 530 U. S. at 68 (II), *Clark*, 273 Ga. at 593 (II) ("Whenever a third party challenges a natural parent's right to custody of his or her child, that party must overcome three constitutionally-based presumptions in favor of parental custody: '(1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the custody of a parent.'").

"[T]he state may interfere with a parent's right to raise his . . . child[ren] only when the state acts to protect the child[ren's] health or welfare and the parent's decision would result in harm to the child[ren]."[29]

> Thus, as used in OCGA § 19-7-1 (b.1), the best interest of the child standard means that the third party must prove by *clear and convincing evidence that the child[ren] will suffer physical or emotional harm if custody were awarded to the biological parent*. Once this showing is made, the third party must then show that an award of custody to him or her will best promote the child[ren]'s welfare and happiness.[30]

The emotional harm required to remove children from the custody of their parents in a case such as this is "*significant, long-term emotional harm*."[31] It does

> not mean merely social or economic disadvantages. Nor does emotional harm refer to the stress and discomfort that naturally accompanies a change in home and/or school. Thus, in determining if a child will suffer harm in the custody of her parent, a court should focus on the parent's ability to provide for the children in a manner sufficient to preclude the need for an entity of the government to intervene and separate the children from the parent, and a court is not permitted to terminate a

---

[29] *Clark*, 273 Ga. at 597 (IV).

[30] (Punctuation omitted; emphasis supplied.) *Mashburn*, 353 Ga. App. at 43 (1), quoting *Clark*, 273 Ga. at 599 (V).

[31] (Emphasis supplied.) *Strickland*, 298 Ga. at 631 (1).

parent's natural right to custody merely because it believes that the child might have better financial, educational, or moral advantages elsewhere. In other words, the parent's ability to raise [his] children is not to be compared to the fitness of a third person.[32]

With this framework in mind, we turn to the evidence admitted at trial by the grandparents. The grandparents introduced only the testimony of three witnesses: themselves and the children's aunt (the grandparents' daughter-in-law). The aunt testified that she loved the children and visited with them regularly. According to the aunt, the mother moved home to Georgia because she was a victim of domestic violence. The aunt attended approximately 15 hearings in the Connecticut divorce action with the mother. The aunt also testified about the few visits the father made to Georgia to see the children prior to the mother's death and how the father only saw them on a limited basis and chose not to see the children on the second day of one visit when the mother refused to participate in a family meeting and again the following summer when the mother imposed time limits on his visitation. The aunt also confirmed that the grandparents had a stable home and were physically able to

---

[32] (Citations and punctuation omitted.) *Mashburn*, 353 Ga. App. at 43 (1), quoting *Clark*, 273 Ga. at 598 (IV), *Jewell v. McGinnis*, 346 Ga. App. 733, 736 (1) (816 SE2d 683) (2018).

care for the children. Finally, the aunt testified that she was not aware of any support, gifts, or cards sent by the father. The aunt was not asked about nor did she testify regarding any physical or emotional harm to the children if custody was returned to the father.

The grandmother testified next, explaining that their family was close and had family gatherings and that the children had the benefit of the love and affection of all the family. She also reiterated the testimony about the father's failed attempts at visitation and then discussed her home and the benefits to the children of living with the grandparents, who were able to financially and physically care for them. When asked if the father had called to ask about the kids, she responded, "never," and she confirmed that the father had not sent any presents or support. Finally, she testified that it was in the children's best interest to "live where they are, to be able to grow up knowing that they matter. That they are able to achieve anything that they want to because they have the support and love day after day after day." The grandmother was not asked about nor did she testify regarding any physical or emotional harm to the children if custody was returned to the father.

The grandfather was the third and final witness. He testified that at the time of the hearing, the safety and well-being of the grandchildren were the most important

thing to him, and he believed "beyond the shadow of a doubt" that it was in the best interest of the children for the grandparents to have permanent custody. The grandparents' lawyer did ask the grandfather on direct-examination what emotional and physical effects the children would suffer if they were returned to live with their father. In response, the grandfather described the children's lives while in the care of the grandparents, including their support by extended family and members of their church. He explained that the children are "happy, secure, comfortable, . . . [and] confident" and receive counseling several times a week, and he concluded his testimony by stating that "it would be devastating . . . [for them t]o leave the network of love and support that they have." The grandfather did not testify, however, regarding any physical or emotional harm to the children if custody was awarded to the father.

There is no dispute that the grandparents care deeply for the children, and the testimony at trial shows that they have provided the children with a safe, loving home since the death of their mother. But this is insufficient to support the trial court's order granting them custody over the father's objection.[33] To meet their burden, the

---

[33] At the final hearing, the superior court found that the children "would be irreparably harmed by ripping them out of the family situation they have enjoyed since 2017," and that it was clearly in the best interest of the children for the

24

grandparents had to first show by clear and convincing evidence that the children would suffer physical or emotional harm if custody was returned to the father. They failed to meet this burden, and this failure of proof requires reversal of the trial court's order.[34] The judgment is reversed, and we remand the case to the superior court for further proceedings consistent with this opinion.

---

grandparents to receive full permanent, physical, and legal custody of the children, equating the dad's refusal to visit to "mental, physical abuse of those children." The evidence does not support this conclusion. First, we note that the superior court's ex parte order prohibited the father from "coming about the children" after the mother's death. But more importantly, there was no evidence presented at the final hearing that returning custody to the father would harm the children physically or emotionally or that the father was unable to provide for the children in a manner sufficient to preclude the need for government intervention. The court's order ignored this necessary step and skipped straight to the best-interest analysis. Further, the final order, which was drafted by the grandparents' counsel, improperly includes findings of fact and evidence that were not supported by the evidence at the final hearing. See *Pace v. Pace*, 287 Ga. 899, 900-901 (700 SE2d 571) (2010) (reversing and remanding permanent custody award because the trial court considered evidence beyond that offered at the final hearing without prior notice to the parties); *Alford v. Alford*, 190 Ga. 562, 564 (9 SE2d 895) (1940) ("A rule that would permit the judge to base his judgment on knowledge gained elsewhere than on the trial at which it is rendered would . . . deprive[ ] [the other party] of the legal right to cross-examine[] and otherwise try to controvert such alleged facts.").

[34] See *Mashburn*, 353 Ga. App. at 45-46 (1) (a) (ii), 48-49 (2). See also *Clark*, 273 Ga. at 598 (IV) (noting that "the death of a parent, divorce, or a change in home and school will often be difficult for a child, but some level of stress and discomfort may be warranted when the goal is reunification of the child with the parent").

*Judgment reversed and case remanded with direction. Reese and Brown, JJ.,*

*concur.*